# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NISSAN CHEMICAL CORPORATION,
5-1, Nihonbashi 2-Chome, Chuo-Ku,
Tokyo 103-6119, Japan;

INTERVET INC. D/B/A MERCK
ANIMAL HEALTH,
2 Giralda Farms,
Madison, NJ 07940;

INTERVET INTERNATIONAL BV
D/B/A MSD ANIMAL HEALTH,
Wim de Körverstraat 35,
5831 AN Boxmeer,
The Netherlands;

MERCK SHARP & DOHME LLC,
126 East Lincoln Avenue,
P.O. Box 2000,
Rahway, NJ 07065;

    *Plaintiffs*,

  v.

U.S. FOOD AND DRUG
ADMINISTRATION,
10903 New Hampshire Avenue,
Silver Spring, MD 20993;

CENTER FOR DRUG EVALUATION
AND RESEARCH,
10903 New Hampshire Avenue,
Silver Spring, MD 20993;

ROBERT M. CALIFF, in his official
capacity as Commissioner, U.S. Food and
Drug Administration,
10903 New Hampshire Avenue,
Silver Spring, MD 20993;

Civil Action No. 22-cv-1598

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue, S.W.,
Washington, D.C. 20201;

XAVIER BECERRA, in his official
capacity as Secretary of the U.S.
Department of Health and Human Services,
200 Independence Avenue, S.W.,
Washington, D.C. 20201;

U.S. PATENT AND TRADEMARK
OFFICE,
600 Dulany Street,
Alexandria, VA 22314; and

KATHI VIDAL, in her official capacity as
Director of the U.S. Patent and Trademark
Office,
600 Dulany Street,
Alexandria, VA 22314

            *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Nissan Chemical Corporation ("Nissan"), Intervet Inc. d/b/a Merck Animal

Health, Intervet International B.V. d/b/a MSD Animal Health, and Merck Sharp & Dohme LLC

(collectively, "Plaintiffs") bring this action against Defendants U.S. Food and Drug Administration

("FDA"); the Center for Drug Evaluation and Research ("CDER"); Robert M. Califf, in his official

capacity as Commissioner of Food and Drugs; U.S. Department of Health and Human Services

("HHS"); Xavier Becerra, in his official capacity as Secretary of HHS; U.S. Patent and Trademark

Office ("PTO"); and Kathi Vidal, in her official capacity as Director of the PTO (collectively,

"Defendants"), and allege as follows:

## INTRODUCTION

1.     This case involves an Administrative Procedure Act ("APA") challenge to final agency action taken by FDA regarding BRAVECTO®, a drug patented by Nissan in U.S. Patent No. 7,662,972 (the "'972 patent") and marketed by Intervet Inc. to treat and prevent flea and tick infestations in dogs and cats.

2.     The Federal Food, Drug, and Cosmetic Act ("FDCA") requires that new drugs, including new animal drugs, undergo a lengthy period of testing by the drug sponsor and review by FDA before they can be commercially marketed.  That "regulatory review period" often lasts years, and it frequently reduces the effective term of a patent covering the new drug.  As a result, the regulatory review process reduces the incentive to innovate and poses a barrier to investments in research and development.  Congress addressed that problem by enacting a patent restoration statute, which extends the duration of affected patents to compensate for the time that the drug was delayed in reaching the market due to the FDCA's testing and review requirements.  Plaintiffs and FDA disagree about when BRAVECTO's regulatory review period began, and thus the amount of time by which the corresponding patent term must be extended—an issue that affects BRAVECTO's exclusivity period and thus millions of dollars in BRAVECTO sales.  That dispute boils down to whether FDA correctly interpreted the patent term restoration statute and corresponding regulations, and whether FDA complied with the APA's requirement of reasoned decisionmaking in conducting its analysis.

3.     Although BRAVECTO is covered by the '972 patent that was issued on February 16, 2010, the first of several BRAVECTO drug products was not approved by FDA until May 15, 2014.  During that intervening period, neither Nissan (the patent's owner) nor Intervet Inc. (the

patent's licensee for use in animal health products) could derive commercial benefit from marketing BRAVECTO.

4.     To restore the patent term that was effectively lost during this period, Nissan applied to PTO for a patent term extension under 35 U.S.C. § 156.  Consistent with the statute, PTO referred the application to FDA for a determination of the length of BRAVECTO's regulatory review period.  FDA made an initial determination, and then (after Nissan sought reconsideration) a revised determination on April 12, 2021.  FDA published that revised determination (the "Final Determination") in the Federal Register on June 11, 2021, *see* 86 Fed. Reg. 31,318, and finalized it in a letter to PTO dated February 17, 2022.  While Nissan claimed in its application that the regulatory review period for BRAVECTO began on February 19, 2010, the Final Determination concluded that the regulatory review period did not begin until June 28, 2011—a difference of about 16 months (or 500 days).

5.     The Court should set aside the Final Determination because it is arbitrary, capricious, and contrary to law in several respects.

6.     *First*, the Final Determination relies on a regulation that contravenes the patent term restoration statute.  That statute states that the regulatory review period begins as soon as "an exemption" from the FDCA's requirements becomes "effective" for the relevant drug.  FDA has established two types of exemptions—one for lab-based in vitro and animal testing, and another for clinical testing—both of which allow the drug to be shipped in interstate commerce for the purpose of pre-approval testing by the sponsor.  But FDA's patent term restoration regulation starts the regulatory review period only when the exemption for *clinical* testing becomes effective.  The regulation thus unlawfully shortchanges drug sponsors for the time when the *lab-based* exemption

(but not the clinical exemption) is effective.  FDA compounded this error by failing to provide a reasoned explanation for its underinclusive interpretation of the patent term restoration statute.

7.     *Second*, in identifying the start of the regulatory review period, the Final Determination departs from FDA's longstanding policy and practice without acknowledging the departure or providing a sufficient explanation for the change in course.  From 1990 through at least 2007, FDA routinely tied the start of the regulatory review period to the date when the sponsor's Investigational New Animal Drug ("INAD") application was acknowledged by FDA (the "INAD date").  But in 2009, the agency abruptly changed course, no longer recognizing the INAD date as the start of the testing phase and regulatory review period.  FDA never clearly articulated a new methodology to replace its prior, INAD-focused test.  On one occasion, in 2012, FDA started the regulatory review period for an animal drug on the date when a document referred to as an "NCIE" form was submitted by the sponsor (the "NCIE date").  In other proceedings, FDA applied a different rule or did not recite a rule at all.  Regardless, FDA never acknowledged that it had departed from its pre-2009 policy and practice, nor did the agency provide a reasoned explanation for doing so, as required by the APA.  To the contrary, FDA continued to broadcast— through outward-facing guidance for industry—that the earlier INAD date started the clock.  Yet in deciding the regulatory review period for BRAVECTO, FDA rejected Nissan's request to use the INAD date consistent with longstanding FDA policy, practice, and guidance for industry. FDA's unexplained and unacknowledged course change was arbitrary and capricious.

8.     *Third*, and relatedly, the Final Determination contravenes the APA and violates Plaintiffs' due process rights because FDA failed to provide Plaintiffs with fair notice that the agency would no longer recognize the INAD date as the start of the regulatory review period.

9.     *Fourth*, the Final Determination is inconsistent with the record.  Under the patent term restoration statute, the regulatory review period for an animal drug alternatively begins no later than "the date a major health or environmental effects test on the drug was initiated."  Here, FDA concluded that the regulatory review period began on June 28, 2011, the date that a reproductive safety study began.  But there were other "major . . . test[s]" that led to BRAVECTO's approval and that began much earlier.  FDA erred by failing to account for those studies and their earlier start dates.

10.     Because the Final Determination is arbitrary, capricious, and contrary to law, the Court should set it aside and remand this matter to FDA for issuance of a corrected regulatory review period determination.

## JURISDICTION AND VENUE

11.     This action arises under the APA, 5 U.S.C. §§ 701–706, in that FDA has engaged in final agency action that is the subject of this challenge.

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States; and 28 U.S.C. § 1361, in that this action seeks to compel an officer of the United States to perform a mandatory duty.

13.     This Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the APA, 5 U.S.C. § 702; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

14.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities, some of whom reside in this District, and a substantial part of the events or omissions giving rise to the claims also occurred in this District.

**PARTIES**

15.     Plaintiff Nissan Chemical Corporation is the owner of the '972 patent, which claims fluralaner, the active ingredient in BRAVECTO.  The '972 patent was originally assigned to Nissan Chemical Industries, Ltd.  Thereafter, Nissan Chemical Industries, Ltd. timely applied to PTO for restoration of the '972 patent's term and, in connection with that application, timely sought reconsideration of FDA's initial determination of the regulatory review period for BRAVECTO.  During the course of those proceedings, Nissan Chemical Industries, Ltd. changed its name to Nissan Chemical Corporation.  In 2018, the change of name from Nissan Chemical Industries, Ltd. to Nissan Chemical Corporation was recorded with the PTO; thus, the '972 patent (and corresponding patent term restoration application) is assigned to Nissan Chemical Corporation.  This Complaint refers to Nissan Chemical Corporation and Nissan Chemical Industries, Ltd., collectively as "Nissan."  Nissan Chemical Corporation is headquartered in Tokyo, Japan, and is incorporated in Japan.  Nissan Chemical Corporation manufactures products for the chemical, agrochemical, and pharmaceutical industries.

16.     Plaintiff Intervet Inc. ("Intervet") is the sponsor of new animal drug application ("NADA") 141-426, which is the first approved marketing application for BRAVECTO.  Intervet is headquartered in Madison, New Jersey and incorporated under the laws of the State of Delaware.

17.     Plaintiff Intervet International B.V. d/b/a MSD Animal Health owns an exclusive, worldwide license from Nissan Chemical Corporation for use of the '972 patent in animal health products.  Intervet International B.V. has authorized Intervet to make use of Intervet International B.V.'s rights in the '972 patent.

18.     Plaintiff Merck Sharp & Dohme LLC is the parent company of Intervet and Intervet International B.V. d/b/a MSD Animal Health.  Merck Sharp & Dohme LLC is headquartered in New Jersey and incorporated under the laws of the State of New Jersey.

19.     Defendant HHS is an executive department of the United States Government headquartered in Washington, D.C., and is ultimately responsible for FDA, which makes regulatory review period determinations for the purpose of patent term restoration proceedings.

20.     Defendant Xavier Becerra is the Secretary of HHS.  His official address is in Washington, D.C.  He has ultimate responsibility for oversight of HHS's and FDA's activities, which include making regulatory review period determinations for the purpose of patent term restoration proceedings.  He is sued in his official capacity.

21.     Defendant FDA is an administrative agency within HHS headquartered in Silver Spring, Maryland, and is responsible for making regulatory review period determinations for the purpose of patent term restoration proceedings.

22.     Defendant CDER is a division within FDA that is located in Silver Spring, Maryland, and is responsible for making regulatory review period determinations for the purpose of patent term restoration proceedings.

23.     Defendant Robert M. Califf is the Commissioner of Food and Drugs.  His official address is in Silver Spring, Maryland.  He has ultimate responsibility for oversight of FDA's activities, which include making regulatory review period determinations for the purpose of patent term restoration proceedings.  He is sued in his official capacity.

24.     Defendant PTO is an administrative agency within the United States Department of Commerce, and is headquartered in Alexandria, Virginia.  PTO determines the eligibility of

patents for relief under the patent term restoration statute and issues certificates of extension for eligible patents.

25.     Defendant Kathi Vidal is the Under Secretary of Commerce for Intellectual Property and the Director of the PTO.  Her official address is in Alexandria, Virginia.  She has ultimate responsibility for oversight of the PTO's activities, which include determining the eligibility of patents for patent term extensions and issuing certificates of extension for eligible patents.  She is sued in her official capacity.

## BACKGROUND

### I.     Statutory and Regulatory Background

#### A.     Patent Term Extensions Restore Patent Term Lost During Regulatory Review

26.     A patent "confers upon the patentee an exclusive property [right] in the patented invention."  *Horne v. Dep't of Agric.*, 576 U.S. 350, 359 (2015) (citation omitted).  Subject to any applicable patent term adjustments, patents are issued "for a term beginning on the date on which the patent issues and ending 20 years from the date on which the [earliest] application for the patent was filed."  35 U.S.C. § 154(a)(2).

27.     Before a new animal drug may be commercially marketed, the FDCA requires that it must undergo testing by the sponsor, be reviewed by FDA, and receive FDA approval.  An animal drug's "regulatory review period" includes the time it takes to scientifically test the safety, efficacy, and quality of the drug plus the time it takes for FDA to review and approve the sponsor's marketing application—i.e., the corresponding new animal drug application.  That period usually lasts many years.

28.     The regulatory review period often substantially reduces the effective term of a patent covering the drug, because the owner cannot market a drug (even though it is patented) until

it is approved by FDA.  Under these circumstances, the patent owner does not receive the same effective term for its drug-related patent that other innovators not subject to a regulatory review period receive for their patents.

29.    Congress initially addressed that problem in the Hatch-Waxman Act, which provides a mechanism to restore the term of patents covering human drugs.  *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984). Four years later, Congress enacted the Generic Animal Drug and Patent Restoration Act of 1988, Pub. L. No. 100-670, 102 Stat. 3971 (1988) (the "1988 Restoration Act"), which provides for patent term restorations in the animal drug context.  Specifically, the 1988 Restoration Act extends the term of patents covering an animal drug product for up to 5 years to account for time the drug was subject to testing and regulatory review by FDA.  *See* 35 U.S.C. § 156(g)(4)(A).

30.    When enacting the 1988 Restoration Act, Congress observed that "[p]roducts that require FDA premarket approval, like animal drugs, often entail high development costs.  In addition, animal drug innovators typically lose years of patent protection because of FDA's scientific testing requirements and regulatory review.  While this FDA process is essential to confirming the safety and effectiveness of animal drugs, it can have the effect of reducing incentives to develop new animal drugs."  H.R. Rep. No. 100-972, pt. 1, at 3 (1988).

31.    Patent term restoration, as provided under the 1988 Restoration Act, was designed to ensure the operation of "these important incentives" for research and development of new animal drug products.  *Id.*; *see also* 134 Cong. Rec. 30,272 (1988) (statement of Sen. Hatch) (observing that under the 1988 Restoration Act, "developers of new animal drugs will be able to recoup more of their research and development costs" and will have "the time needed to receive Federal agency marketing approval . . . without any lessening of public health protection"); 134

10

Cong. Rec. 30,560 (1988) (statement of Rep. Waxman) (noting that the 1988 Restoration Act ensures that "animal drug companies" are "assured of additional market time to recoup their investments").

**B.    Procedure for Obtaining a Patent Term Restoration**

32.    To obtain a patent term restoration, a patent owner must apply to the PTO Director within 60 days of receiving marketing approval (from FDA) for the drug product covered by the patent. 35 U.S.C. § 156(d)(1).  The application must contain information about the product subject to regulatory review, about the relevant patent and patent claims, and about the regulatory review period, among other things.  *See id.*

33.    The PTO Director has primary responsibility for evaluating whether the patent meets certain threshold requirements necessary for a patent term restoration.  *See* 35 U.S.C. § 156(e)(1).  For example, the patent term must not be expired before the patent term application is submitted, and the product claimed by the patent must have been subject to a "regulatory review period" before its commercial marketing or use.  *Id.* § 156(a).

34.    After receiving the patent term restoration application and determining the product has been subject to regulatory review, the PTO Director must provide notice and send a copy of the application to the agency that conducted the regulatory review—in the case of animal drugs, HHS.  35 U.S.C. § 156(d)(2)(A)(ii).  The HHS Secretary, acting through FDA, must then determine the applicable "regulatory review period" for the drug product covered by the relevant patent, and must publish a notice of that determination in the Federal Register.  *See* 35 U.S.C. § 156(d)(2)(A); 21 C.F.R. § 60.20.

35.    FDA regulations permit "[a]ny person" to "request a revision of the" agency's regulatory review period determination.  21 C.F.R. § 60.24(a).  Such requests must be filed "within

60 days after [FDA's] initial publication [of the regulatory review period determination] in the Federal Register."  *Id.*  FDA's resolution of a request for revision is considered "final."  21 C.F.R. § 60.26(b).

36.    PTO calculates the patent term extension based on FDA's regulatory review period determination and issues a certificate of extension.  35 U.S.C. § 156(e)(1).  PTO is bound by FDA's final determination of the regulatory review period.  *See Astra v. Lehman*, 71 F.3d 1578, 1578–79 (Fed. Cir. 1995) ("[T]he determination of the regulatory review period . . . is committed by statute to the [FDA]," such that PTO "is not authorized to redetermine or set aside the period determined by the [FDA]."); *see also* 37 C.F.R. § 1.778(c) (providing that FDA determines the regulatory review period for animal drugs).

37.    Patent term restoration proceedings, including proceedings before FDA to determine the relevant regulatory review period, are non-adversarial and informal.  For example, FDA is not represented as an adverse litigant in the proceedings, and there are no discovery mechanisms, trial-like procedures, or formal motions or briefing.  Hearings are generally unavailable, and are permitted only when a third party challenges a regulatory review period determination on the ground that the applicant did not act with due diligence in seeking FDA approval (and is therefore responsible for some of the lost patent term).  *See* 21 C.F.R. § 60.40(a).  FDA "consult[s] its records and experts . . . to determine the length of the product's regulatory review period."  21 C.F.R. § 60.20(a); *see also* 21 C.F.R. § 60.26(a)(1) (noting that FDA may

"receive[] . . . [n]ew information from PTO records, FDA records, or FDA centers that affects the regulatory review period determination").

### C.      How a Regulatory Review Period Is Calculated

38.      The regulatory review period is comprised of two components: a *testing* phase and an *approval* phase.  *See* 35 U.S.C. § 156(g)(4)(B); *see also* 21 C.F.R. § 60.22 ("[A] product's regulatory review period . . .  consists of the sum of the lengths of a testing phase and an approval phase").

39.      Subject to other limitations not relevant here, the patent term may be extended by the sum of (1) one half the length of the testing phase plus (2) the entire length of the approval phase, which occurs after the patent issue date.  *See* 35 U.S.C. § 156(c).  The approval phase is not at issue in this suit.

40.      For animal drugs, the testing phase begins on the "earlier" of two potential dates:

    a.    "the date a major health or environmental effects test on the drug was initiated" (i.e., the **"major test prong"**); *or*

    b.    "the date an exemption under subsection (j) of section 512 became effective for the approved new animal drug product" (i.e., the **"exemption prong"**).  35 U.S.C. § 156(g)(4)(B)(i).

### 1.      Major Test Prong

41.      Under the major test prong, the testing phase of the regulatory review period begins no later than "the date a major health or environmental effects test on the drug was initiated."  35 U.S.C. § 156(g)(4)(B)(i).

42.      The statute defines "major health or environmental effects test" as "a test which is reasonably related to the evaluation of the health or environmental effects of a product, which

requires at least six months to conduct, and the data from which is submitted to receive permission for commercial marketing or use."  35 U.S.C. § 156(f)(3).  "Periods of analysis or evaluation of test results are not to be included in determining if the conduct of a test required at least six months."  *Id.*; *see also* 21 C.F.R. § 60.22(e) (similar definition under implementing regulation).

### 2.     Exemption Prong

43.     Under the exemption prong, the testing phase of the regulatory review period begins no later than "the date an exemption under subsection (j) of section 512 became effective for the approved new animal drug product."  35 U.S.C. § 156(g)(4)(B)(i).

44.     In turn, "subsection (j) of section 512" of the FDCA expressly delegates to FDA authority to establish certain "exemption[s] of drugs for research" purposes.  21 U.S.C. § 360b(j).  Specifically, under the statute, FDA "shall promulgate regulations for exempting from the operation of this section new animal drugs . . . intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of animal drugs."  *Id.*

45.     Without an exemption under 21 U.S.C. § 360b(j), a new animal drug—even one used only for research purposes—would be considered "unsafe" and "adulterated" and therefore could not be "introduced" or "delivered" into interstate commerce without violating the FDCA.  *See* 21 U.S.C. §§ 331, 351, 360b(a)(3).

46.     FDA has exercised its expressly delegated rulemaking authority to promulgate two types of animal-drug exemptions under 21 U.S.C. § 360b(j).

47.     *First*, under 21 C.F.R. § 511.1(a), "[n]ew animal drugs" used "for tests in vitro and in laboratory research animals"—i.e., lab-based testing—are automatically exempt as long as the sponsor complies with certain labeling, due diligence, and recordkeeping requirements.  "A

shipment or other delivery of a new animal drug . . . intended solely for tests in vitro or in animals used only for laboratory research purposes shall be exempt [under the lab-based testing provision] . . . if it is labeled" with the following language: "Caution. Contains a new animal drug for investigational use only in laboratory research animals or for tests in vitro. Not for use in humans." 21 C.F.R. § 511.1(a).

48.    *Second*, under 21 C.F.R. § 511.1(b), "[n]ew animal drugs for clinical investigation" are exempt if the sponsor satisfies a different set of labeling, due diligence, and recordkeeping requirements.

49.    For purposes of this litigation, the key difference between the lab-based testing exemption in 21 C.F.R. § 511.1(a) and the clinical testing exemption in 21 C.F.R. § 511.1(b) is that only the latter requires the sponsor of the investigation to submit to FDA a "Notice of Claimed Investigational Exemption for a New Animal Drug."  By contrast, a sponsor need not submit a "Notice of Claimed Investigational Exemption for a New Animal Drug" to qualify for a lab-based testing exemption under 21 C.F.R. § 511.1(a).

50.    That distinction matters here because the patent term restoration statute provides that the testing phase of a drug's regulatory review period begins no later than "the date *an exemption* … became effective."  35 U.S.C. § 156(g)(4)(B)(i) (emphasis added).  Because it is possible to trigger the lab-based testing exemption in 21 C.F.R. § 511.1(a) *without* submitting a "Notice of Claimed Investigational Exemption for a New Animal Drug" to FDA, it is likewise unnecessary to make such a submission to begin the testing phase of the regulatory review period. In other words, the statute and 21 C.F.R § 511.1 together provide two ways to start the testing

phase, only one of which requires the sponsor to submit a "Notice of Claimed Investigational Exemption for a New Animal Drug" to FDA.

51.     FDA's patent term restoration regulation accounts for only one of those two pathways.  Specifically, the exemption prong of the regulation determines the start of the testing phase based solely on "the date on which the agency acknowledges the filing of a notice of claimed investigational exemption for a new animal drug."  21 C.F.R. § 60.22(d).  The regulation thus takes no account of lab-based testing exempted under 21 C.F.R. § 511.1(a), despite the statute's directive for animal drugs that the testing phase shall begin whenever "an exemption" becomes "effective."

### D.     FDA's Shifting Method for Calculating the Testing Phase

52.     FDA has interpreted and applied 21 C.F.R. § 60.22(d) differently over time.  FDA has done so without acknowledging the changes, without adequately explaining any reasons for the changes, and without providing fair notice to industry of the changes.

### 1.     FDA Announces That The Regulatory Review Period's Testing Phase Begins When The Agency Assigns An INAD Number

53.     In public statements regarding the statute's regulatory review period for animal drugs, FDA announced a policy that the agency would start the testing phase once a drug sponsor submits an INAD application and would treat the INAD application as "a notice of claimed investigational exemption for a new animal drug" as that term is used in FDA's regulations.

54.     For example, in the 1991 preamble to the proposed rule later codified in 21 C.F.R. § 60.22(d)(1), FDA stated that "[p]roposed § 60.22(d) defines the testing phase for an animal drug as the period beginning on the date when the marketing applicant began a major health or environmental effects test or the effective date for a notice of claimed investigational exemption for a new animal drug (INAD), whichever is earlier," and that "the date on which the agency acknowledges the filing of an INAD should constitute the 'effective date' for an INAD."  56 Fed.

Reg. 5,784, 5,786 (Feb. 13, 1991).  FDA's references to "the date when the marketing applicant began a major health or environmental effects test" and "the effective date for a notice of claimed investigational exemption for a new animal drug (INAD)" correspond, respectively, to the "major test prong" and "exemption prong" of the regulatory review period determination addressed in paragraphs 40–51 above.

55.     When FDA adopted 21 C.F.R. § 60.22(d)(1) in 1992, *see* 57 Fed. Reg. 56,260, 56,262 (Nov. 27, 1992), the agency did not disavow the policy announced in the 1991 preamble that, with respect to the exemption prong, the testing phase begins on "the effective date for a notice of claimed investigational exemption for a new animal drug (INAD)" and that "the date on which the agency acknowledges the filing of an INAD should constitute the 'effective date' for an INAD."  56 Fed. Reg. at 5,786.

56.      Over the next decade, FDA issued staff manuals consistent with the policy that FDA had announced in the 1991 preamble—i.e., that, with respect to the exemption prong, the testing phase starts on the INAD date.  *See, e.g.*, FDA, Center for Veterinary Medicine, Program Policy and Procedures Manual 1240.3000: New Animal Drugs for Investigational Use 1–2 (1997) (attached as Ex. A).

57.     A few years later, in draft guidance for industry published in 2002, FDA stated that "[t]he first [regulatory review] period (sometimes called the investigational period) begins when the sponsor submits a request to CVM to establish an INAD file."  FDA, Center for Veterinary Medicine, The Administrative New Animal Drug Application Process: Draft Guidance for Industry #132, at 7 (2002) ("2002 Guidance") (attached as Ex. B).  The 2002 Guidance stated that it "represent[ed] the agency's current thinking on this matter."  *Id*. at 2.

### 2.  FDA Precedents Treat The INAD Date As The Start Of The Testing Phase

58.  FDA routinely applied this policy in its regulatory review precedents from 1990 to 2007, starting the testing phase on the date that the agency acknowledged the sponsor's INAD application by assigning an INAD number.

59.  In patent term restoration proceedings regarding Dormosedan, an animal drug, FDA concluded that the "date an exemption under subsection 512(j) of the Federal Food, Drug, and Cosmetic Act became effective" was May 23, 1983, because "FDA records indicate that the date of FDA's official acknowledgment letter assigning a number to the INAD was May 23, 1983, which is considered to be the effective date for the INAD." 55 Fed. Reg. 9,773, 9,773 (Mar. 15, 1990).

60.  In patent term restoration proceedings regarding Equestrolin, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act became effective" was January 8, 1985, because "FDA records indicate that the date of FDA's official acknowledgment letter assigning a number to the INAD was January 8, 1985, which is considered to be the effective date for the INAD." 55 Fed. Reg. 17,821, 17,821 (Apr. 27, 1990).

61.  In patent term restoration proceedings regarding Synanthic, an animal drug, FDA concluded that the "date an exemption under subsection 512(j) of the Federal Food, Drug, and Cosmetic Act became effective" was March 25, 1974, because "FDA records indicate that the date of FDA's official acknowledgment letter assigning a number to the INAD was March 25, 1974, which is considered to be the effective date for the INAD." 55 Fed. Reg. 52,219, 52,220 (Dec. 20, 1990).

18

62.     In patent term restoration proceedings regarding Pirsue Aqueous Gel, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act became effective" was February 17, 1983, because "FDA records indicate that the date of FDA's official acknowledgment letter assigning a number to the INAD was February 17, 1983, which is considered to be the effective date for the INAD." 59 Fed. Reg. 10,136, 10,137 (Mar. 3, 1994).

63.     In patent term restoration proceedings regarding Aviax, an animal drug, FDA concluded that the "date an exemption under subsection 512(j) of the Federal Food, Drug, and Cosmetic Act involving this animal drug product became effective" was July 9, 1987, because "FDA records indicate that the date of FDA's official acknowledgement letter assigning a number to the INAD was July 9, 1987, which is considered to be the effective date for the INAD." 59 Fed. Reg. 46,053, 46,054 (Sept. 6, 1994).

64.     In patent term restoration proceedings regarding Optimmune, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act became effective" was May 24, 1990, because "FDA records indicate that the date of FDA's official acknowledgement letter assigning a number to the INAD was May 24, 1990, which is considered to be the effective date for the INAD." 61 Fed. Reg. 15,264, 15,264 (Apr. 5, 1996).

65.     In patent term restoration proceedings regarding Dectomax, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act became effective" was October 26, 1988, because "FDA records indicate that the date of FDA's official acknowledgment letter assigning a number to the INAD was October 26,

1988, which is considered to be the effective date for the INAD." 62 Fed. Reg. 6,263, 6,263 (Feb. 11, 1997).

66.    In patent term restoration proceedings regarding Baytril, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act became effective" was November 24, 1984, because "FDA records indicate that the date of FDA's official acknowledgment letter assigning a number to the INAD was November 24, 1984, which is considered to be the effective date for the INAD." 62 Fed. Reg. 12,831, 12,832 (Mar. 18, 1997).

67.    In patent term restoration proceedings regarding Anipryl, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act (the act) (21 U.S.C. 360b(j)) became effective" was January 15, 1991, because "FDA records indicate that the date of FDA's letter assigning a number to the INAD was January 15, 1991, which is considered to be the effective date for the INAD." 63 Fed. Reg. 41,578, 41,579 (Aug. 4, 1998).

68.    In patent term restoration proceedings regarding Rimadyl, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act (the act) (21 U.S.C. 360(b)(j)) became effective" was October 30, 1978, because "FDA records indicate that the date of FDA's letter assigning a number to the INAD was October 30, 1978, which is considered to be the effective date for the INAD." 63 Fed. Reg. 54,716, 54,716 (Oct. 13, 1998).

69.    In patent term restoration proceedings regarding Bapten, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the act became effective" was June 11, 1982, because "FDA records indicate that the date of FDA's letter assigning a number to the

INAD was June 11, 1982, which is considered to be the effective date for the INAD." 65 Fed. Reg. 4,982, 4,982–83 (Feb. 2, 2000).

70.    In patent term restoration proceedings regarding Deramaxx, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360b(j)) involving this animal drug product became effective" was January 21, 1998, because "FDA records indicate that the date of FDA's letter assigning a number to the INAD was January 21, 1998, which is considered to be the effective date for the INAD." 68 Fed. Reg. 67,194, 67,195 (Dec. 1, 2003).

71.    In patent term restoration proceedings regarding Zubrin, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act (the act) involving this animal drug product became effective" was October 28, 1996, because "FDA records indicate that the date of FDA's letter assigning a number to the INAD was October 28, 1996, which is considered to be the effective date for the INAD." 70 Fed. Reg. 43,701, 43,702 (July 28, 2005).

72.    In patent term restoration proceedings regarding Surpass, an animal drug, FDA concluded that the "date an exemption under subsection 512(j) of the act became effective" was March 6, 1998, because "FDA records indicate that the date of FDA's letter assigning a number to the INAD was March 6, 1998, which is considered to be the effective date for the INAD." 71 Fed. Reg. 5,859, 5,860 (Feb. 3, 2006).

73.    In patent term restoration proceedings regarding Cydectin, an animal drug, FDA concluded that "date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act (the act) (21 U.S.C. 355(j)) involving this animal drug product became effective" was April 5, 1990, because "FDA records indicate that the date of FDA's letter assigning a number to the

INAD was April 5, 1990, which is considered to be the effective date for the INAD." 71 Fed. Reg. 54,993, 54,994 (Sept. 20, 2006). The U.S. Court of Appeals for the Federal Circuit upheld FDA's regulatory review period determination, explaining that the "regulatory review period for Cydectin . . . began on April 5, 1990, when at Wyeth's request, FDA established an INAD file for Cydectin, marking the beginning of the testing phase." *Wyeth Holdings Corp. v. Sebelius*, 603 F.3d 1291, 1295 (Fed. Cir. 2010).

74. In patent term restoration proceedings regarding A180, an animal drug, FDA concluded that the "date an exemption under section 512(j) of the Federal Food Drug and Cosmetic Act involving this animal drug product became effective" was January 14, 1988, because "FDA records indicate that the date of FDA's letter assigning a number to the INAD was January 14, 1988, which is considered to be the effective date for the INAD." 72 Fed. Reg. 14,280, 14,281 (Mar. 27, 2007).

75. In sum, from 1990 to 2007, consistent with the policy FDA announced in the preamble to the proposed rule in 21 C.F.R. § 60.22(d)(1) and then in the 2002 Guidance, FDA routinely issued determinations that started the testing phase of the regulatory review period on the date that the agency acknowledged the sponsor's INAD application by assigning an INAD number. FDA did so on the grounds that this date was "the effective date for the INAD."

76. Plaintiffs are aware of only a single case during the period from 1990 to 2007 where FDA started the testing phase of the regulatory review period on the date that a sponsor filed a "notice of claimed investigational exemption." In 2004, in patent term restoration proceedings regarding Neutersol, an animal drug, FDA determined that the "filing of a notice of claimed investigational exemption . . . [was] considered to be the effective date for the INAD." 69 Fed. Reg. 40,944, 40,944 (July 7, 2004) ("Neutersol Determination"). However, the Neutersol

Determination did not (1) state that FDA was adopting a new policy for identifying the start of the testing phase or (2) explain its apparent departure from the precedent described above. Further, it was not clear from the face of the Neutersol Determination that FDA *was* applying a new policy. For example, the Neutersol Determination did not use the acronym "NCIE," and thus a "notice of claimed investigational exemption" could have been reasonably understood to designate an INAD application. Indeed, FDA used the phrase "effective date for the INAD," just as it had done in its prior regulatory review precedents that started the testing phase on the date that the agency acknowledged the sponsor's INAD application.

77.     Further, after FDA issued the Neutersol Determination in 2004, the agency issued at least four separate regulatory review period determinations that started the testing phase "on the date of FDA's letter assigning a number to the INAD." 70 Fed. Reg. 43,701 (July 28, 2005); 71 Fed. Reg. 5,859 (Feb. 3, 2006); 71 Fed. Reg. 54,993 (Sept. 20, 2006); 72 Fed. Reg. 14,280 (Mar. 27, 2007). FDA also issued at least three subsequent regulatory review period determinations that started the testing phase on the date "the investigational new animal drug application (INAD) became effective." 71 Fed. Reg. 57,978 (Oct. 2, 2006); 72 Fed. Reg. 14,119 (Mar. 26, 2007); 72 Fed. Reg. 30,594 (June 1, 2007).

### 3.     FDA Abandons Its Policy And Practice of Treating The INAD Date As The Start Of The Testing Phase

78.     In 2009, FDA abruptly departed from its longstanding policy and practice of using the INAD date as the start of the testing phase. FDA made this change without acknowledging that the agency had followed a different policy for more than fifteen years, disavowing the statements in the 1991 preamble published in the Federal Register, explaining the agency's reasons for the changed approach, considering the industry's serious reliance interests in the former policy,

repudiating its prior regulatory review precedents published in the Federal Register, revising its guidance for industry, or otherwise providing industry with notice of the change.

79.     For example, in patent term restoration proceedings regarding Vetmedin, an animal drug, FDA concluded that the testing phase of the regulatory review period began on October 20, 1999.  74 Fed. Reg. 6,639, 6,640 (Feb. 10, 2009) ("Vetmedin Determination").  FDA provided the following analysis in support of that determination:   "[T]he date that a major health or environmental effects test is begun or the date on which the agency acknowledges the filing of a notice of claimed investigational exemption for a new animal drug, whichever is earlier, is the effective date for the INAD.  According to FDA records, October 20, 1999, is the effective date for the INAD."  *Id.*  However, that discussion was merely a restatement of FDA's regulation, which included the phrase "notice of claimed investigational exemption for a new animal drug," 21 C.F.R. § 60.22(d)(1), and which the agency had in the past consistently interpreted to refer to an "INAD."  *See* 56 Fed. Reg. at 5,786.

80.     Nowhere in the Vetmedin Determination did FDA acknowledge that it was departing from its prior policy and practice for identifying the start of the testing phase or provide an explanation for the change in course.

81.     Further, it was not clear from the face of the Vetmedin Determination that FDA *was* departing from past agency policy and practice.  The Vetmedin Determination used the phrase "effective date for the INAD" as in prior regulatory review precedents, and the Vetmedin Determination did not make clear whether FDA was relying on the "major test" or "exemption" prong in order to calculate the start of the testing phase.  Nor did the Vetmedin Determination specify when the drug sponsor had initially submitted an INAD application or when FDA had initially acknowledged receipt or assigned a number to that INAD.  Only by accessing the

underlying PTO docket for the Vetmedin matter—along with the sponsor's application for a patent term extension—is it possible to determine that (1) the sponsor requested that FDA begin the testing phase on the date an INAD number was assigned (consistent with the agency's longstanding policy) but that (2) FDA rejected that request and instead selected a different date (departing from the agency's longstanding policy and practice).

82.     Subsequently, FDA continued to issue regulatory review period determinations for animal drugs that were similar in form and content to the Vetmedin Determination. *See, e.g.*, 74 Fed. Reg. 10,596 (Mar. 11, 2009); 74 Fed. Reg. 10,597 (Mar. 11, 2009); 74 Fed. Reg. 10,744 (Mar. 12, 2009); 76 Fed. Reg. 24,034 (Apr. 29, 2011); 79 Fed. Reg. 30,854 (May 29, 2014); 79 Fed. Reg. 33,763 (June 12, 2014); 80 Fed. Reg. 26,274 (May 7, 2015); 83 Fed. Reg. 1365 (Jan. 11, 2018). Like the Vetmedin Determination, these decisions did not (1) acknowledge that FDA was departing from its prior policy and practice for identifying the start of the testing phase or (2) provide an explanation for the about-face.  Nor was it clear from the face of the decisions that FDA *was* departing from its longstanding approach.  For example, in these precedents, FDA did not make clear whether FDA was relying on the "major test" or "exemption" prong in order to calculate the start of the testing phase.  And when referring to the submission that would trigger the start of the testing phase, FDA used the phrase "notice of claimed investigational exemption for a new animal drug," which the agency had in the past consistently interpreted to refer to an "INAD." *See* 56 Fed. Reg. at 5,786; *supra* ¶¶ 59–74.

83.     In other decisions published after 2009, FDA stated that it was relying on the "exemption" prong to establish the start of the testing phase, but the agency continued to use the phrase "notice of claimed investigational exemption for a new animal drug" to describe the relevant submission that started the testing phase. *See, e.g.*, 79 Fed. Reg. 27,315 (May 13, 2014);

80 Fed. Reg. 76,701 (Dec. 10, 2015); 83 Fed. Reg. 6,577 (Feb. 14, 2018).  Again, that phrase was

lifted directly from the patent term extension regulation, 21 C.F.R. § 60.22(d)(1), and the agency

had in the past consistently interpreted that phrase to refer to an "INAD," *see* 56 Fed. Reg. at 5,786;

*supra* ¶¶ 59–74.  In still other cases, FDA used the shortened phrase "Notice of Claimed

Investigational Exemption" without using the "NCIE" acronym.  *See* 79 Fed. Reg. 18,563 (Apr. 2,

2014); 79 Fed. Reg. 27,879 (May 15, 2014).

84.    Indeed, there is only one case where FDA clearly tied the start of the testing phase

to the submission of an "NCIE" form.  In patent term restoration proceedings regarding Equidone

Gel, an animal drug, FDA concluded that the testing phase of the regulatory review period began

on the date that sponsor submitted an "NCIE."  77 Fed. Reg. 26,556, 26,557 (May 4, 2012)

("Equidone Gel Determination").  FDA provided the following analysis in support of that

determination:  "The date an exemption under section 512(j) of the Federal Food, Drug, and

Cosmetic Act (21 U.S.C. 360b(j)) became effective: March 26, 1993.  The applicant claims

February 24, 1992, as the date the investigational new animal drug application (IND) became

effective.  However, the date that a major health or environmental effects test is begun or the date

on which the Agency acknowledges the filing of a notice of claimed investigational exemption

(NCIE) for a new animal drug, whichever is earlier, is the effective date for the IND.  According

to FDA records, the applicant's first submission of an NCIE was March 26, 1993, which is the

effective date for the IND."  *Id.*

85.    FDA's regulatory review precedents during this period were marked by other

inconsistencies as well.  For example, sometimes the agency appeared to recognize that the mere

"submission" of a notice of claimed investigational exemption (for a new animal drug) could

trigger the start of the testing phase, *see, e.g.*, 79 Fed. Reg. 18,563 (Apr. 2, 2014), while at other

times the agency utilized the "received date," 79 Fed. Reg. 27,315 (May 13, 2014), or the "date on which the agency acknowledge[d] the filing" of the submission, *see, e.g.*, 80 Fed. Reg. 76,701 (Dec. 10, 2015).  FDA followed a similarly shifting approach when applying the "major test" prong: the agency alternated between a focus on the "received date of the first submission that includes a study with substantial data," 79 Fed. Reg. 18,563 (Apr. 2, 2014), and "the date a major health or environmental effects test [was] begun," 79 Fed. Reg. 30,854 (May 29, 2014).

86.     During this period, FDA issued internal staff manuals that distinguished between an INAD application and an NCIE form.  *See, e.g.*, FDA, Center for Veterinary Medicine, Program Policy and Procedures Manual 1243.4065: Requirements for Investigational New Animal Drug Exemptions 1, 3 (2008) (attached as Ex. C) ("The requirements for establishing an (J)INAD file[1] are separate from the requirements for sponsors seeking an investigational exemption … the sponsor must establish an investigational new animal drug file ((J)INAD) and meet the requirements for an investigational exemption before shipping the drug in interstate commerce.").  The internal manuals instructed FDA staff that sponsors must submit a new form, called an NCIE form, to claim an exemption for clinical testing.  *Id.* at 4 (stating that "[t]he exemption [for clinical testing] does not apply until an NCIE form is submitted").  Since first issuing this staff manual in 2008, FDA reissued it in 2009, 2014, 2017, 2018, 2021, and 2022.

87.     FDA also issued additional internal staff manuals offering revised understandings of the INAD and NCIE submissions.

88.     In 2009, for example, FDA issued a manual for staff on the topic of evaluating an NCIE form.  *See* FDA, Center for Veterinary Medicine, Program Policy and Procedures Manual 1243.4066: Notice of Claimed Investigational Exemption (NCIE) (2009) (attached as Ex. D).

---

[1] JINAD refers to a generic investigational new animal drug application.

FDA described "NCIE FORM FDA 3458" as a "drug shipment notice" that serves as a "written notification to FDA of a sponsor's intent to ship an unapproved new animal drug … for use in investigations intended to be conducted to support approval of new animal drugs." *Id.* at 1.

89.     Then in March 2010, FDA provided its staff with instructions on opening an INAD file. *See* FDA, Center for Veterinary Medicine, Program Policy and Procedures Manual 1243.4000: Processing a Request to Open a (J)INAD File (2011), at 4 (attached as Ex. E) (noting prior version finalized on March 15, 2010).  Unlike its 1997 manual, which referred to an INAD as an application or body of information that supports a claim for an exemption, the revised manual described "INADs" as files that support new animal drug applications (also known as "NADAs") more generally. *Id.* at 1.

90.     Despite these developments, FDA never withdrew its 2002 Guidance for industry, which stated that the testing phase of the regulatory review period "begins when the sponsor submits a request to CVM to establish an INAD file." *See supra* ¶ 57.

91.     To the contrary, FDA finalized its 2002 Guidance in 2015 without any material revisions regarding the relevant trigger date for the start of the testing phase.  The 2015 final guidance for industry contains the same statement from the 2002 Guidance that "[t]he first period (sometimes called the investigational period) begins when the sponsor submits a request to CVM to establish an INAD file, or when a major health or environmental effects test is initiated, and ends when an NADA is submitted."  FDA, Center for Veterinary Medicine, Administrative Applications and the Phased Review Process: Guidance for Industry #132, at 10 (2015) ("2015 Guidance") (attached as Ex. F).

92.     FDA retained the same statement after updating this guidance again in 2018, which is the version that remains in effect today. *See* FDA, Center for Veterinary Medicine,

Administrative Applications and the Phased Review Process: Guidance for Industry #132 11 (2018) ("2018 Guidance") (attached as Ex. G) ("The first period (sometimes called the investigational period) begins when the sponsor submits a request to CVM to establish an INAD file, or when a major health or environmental effects test is initiated, and ends when an NADA is submitted."). Like each prior iteration, the 2018 Guidance "represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic." *Id*. at 3.

93.     In other words, even though in 2009 FDA as a matter of *practice* departed from its longstanding policy of using the INAD date to start the testing phase of the regulatory review period, the agency has never revised its *guidance* for industry to reflect that departure. Instead, FDA has continued to publish guidance—consistent with its original 1991 policy and pre-2009 practice—stating that the INAD date marks the start of the testing phase.

### E.     FDA's Phased Review Process for a New Animal Drug Application

94.     An applicant for approval of a new animal drug product may submit the entire marketing application (i.e., the new animal drug application) as a single submission. 21 C.F.R. § 514.1(b).

95.     Alternatively, an applicant may voluntarily submit the required technical sections of the application—addressing the drug's efficacy, safety, quality, and other characteristics—on a rolling basis to an investigational new animal drug (INAD) file under FDA's phased review process. *See* 2018 Guidance at 4. FDA encourages sponsors to utilize phased review because it streamlines the drug review process and "has created efficiencies for CVM and the animal pharmaceutical industry." *Id.* at 3–4.

96.     FDA issues a technical section complete letter for each technical section submitted under phased review when all requirements for the technical section are met. *Id.* at 6. This phased

method for submitting a new animal drug application culminates with the filing of an "administrative NADA," which may be filed only after the applicant receives technical section complete letters for all of the technical sections required to support the approval of a new animal drug. *Id.* at 9–10.

97. The submission of the new animal drug application ends the testing phase and begins the approval phase of the regulatory review period. *See* 35 U.S.C. § 156(g)(4)(B); *see also* 21 C.F.R. § 60.22(d)(2) ("The approval phase begins on the date a marketing application . . . is initially submitted to FDA").

## II. Factual and Procedural Background

### A. The '972 Patent

98. Intervet is the sponsor of BRAVECTO products, including NADA 141-426 for BRAVECTO (fluralaner) chewable tablets for dogs, the first approved BRAVECTO product. This BRAVECTO product for oral administration is indicated for the treatment and prevention of flea infestations and the treatment and control of tick infestations in dogs.

99. Intervet is also the sponsor of the approved NADA 141-459 for BRAVECTO (fluralaner) topical solution. This BRAVECTO product for topical administration is indicated for the treatment and prevention of flea infestations and the treatment and control of tick infestations in both dogs and cats.

100. On September 14, 2006, the named inventors, Takeshi Mita, Takamasa Kikuchi, Takashi Mizukoshi, Manabu Yaosaka, and Mitsuaki Komoda, assigned their right, title and interest in U.S. Patent Application No. 11/514,921—which claims novel isoxazoline-substituted benzamide compounds as well as pesticides containing one or more of those compounds as an active ingredient—to Nissan. The assignment was recorded with PTO on October 3, 2006.

101.    On August 18, 2008, pursuant to a license and development agreement, Nissan granted Intervet International BV d/b/a MSD Animal Health an exclusive worldwide license under Nissan's patents, including any patent issuing from U.S. Patent Application No. 11/514,921, to conduct product development and commercialization of the covered compounds, including fluralaner, for use in the animal health space.  This agreement grants Intervet International BV the right to sublicense its rights in Nissan's patents.  The agreement has been in effect continuously since 2008 and remains in effect today.

102.    On February 16, 2010, PTO granted Patent Application No. 11/514,921 and issued U.S. Patent No. 7,662,972, titled "Isoxazoline-Substituted Benzamide Compound and Pesticide."

103.    Claims 1–6, 8, and 9 of the '972 patent claim fluralaner, the active ingredient in BRAVECTO.

104.    The expiration date of the '972 patent is April 26, 2025.

**B.    Intervet's Development of BRAVECTO and FDA's Approval**

105.    On August 6, 2007, Intervet submitted to FDA a request to establish an INAD file to pursue development of BRAVECTO[2] in cats and dogs.

106.    On August 16, 2007, FDA assigned INAD 11-656 for the investigation of BRAVECTO in dogs and INAD 11-658 for the investigation of BRAVECTO in cats.  These INAD files led to marketing authorization for the topical BRAVECTO formulation in 2016.

107.    On August 20, 2008, Intervet requested a meeting with FDA to discuss development plans for BRAVECTO.  *See* Letter from Intervet to Dr. Melanie R. Berson, Director, Division of Therapeutic Drugs for Non-Food Animals, Center for Veterinary Medicine, FDA

---

[2] BRAVECTO is in some instances referred to by its generic name (fluralaner) as well as other names, such as CBPI and AH 252723.  For consistency, this Complaint refers to the drug as "BRAVECTO."

(Aug. 20, 2008) (attached as Ex. H).  This meeting occurred on October 9, 2008 and covered Intervet's proposal to conduct target animal safety and effectiveness studies, among other topics. Intervet also met with FDA in 2009 to discuss manufacturing-related topics for the topical BRAVECTO formulation.

108.    Intervet conducted extensive safety and efficacy testing of both the topical BRAVECTO formulation as well as the oral BRAVECTO formulation—which helped generate more robust safety data—under the 11-656 and 11-658 INAD files.  Many of these studies were conducted over a period of six or more months, excluding time required to analyze or evaluate results.  FDA considered and permitted Intervet to rely on these study results in connection with Intervet's application for approval of an oral BRAVECTO formulation under INAD 11-903 (discussed in ¶¶ 117–21 below).

109.    For example, study V-0084-0046, titled "Study to evaluate the efficacy, the cosmetic effects and the tolerance of a CBPI[3] spot-on solution administered once topically at a dose of 50, 40, 30, 20, 10, or 0 mg/kg body weight against ticks (*Ixodes ricinus*) and/or fleas (*Ctenocephalides felis*) on dogs," evaluated the efficacy of a topical BRAVECTO formulation— i.e., the drug's effectiveness in controlling, preventing, and treating flea and tick infestations. Study V-0084-0046 Final Study Report, at 1 (excerpt attached as Ex. I).  The experimental study dates were October 13, 2008 to June 3, 2009, a period covering more than six months.  *Id.*

110.    Study V-0084-0038, titled "CBPI: Pilot Target Animal Reproductive Safety Study in the Dog," evaluated the reproductive safety of an oral BRAVECTO formulation—i.e., the drug's safety for dogs who become pregnant and its effects on their offspring.  Study V-0084-0038

---

[3] "CBPI" refers to carbamoyl-benzamide-phenyl-isoxazoline; it is the chemical name for the class of the active ingredient in BRAVECTO (fluralaner).

Final Study Report, at 1 (excerpt attached as Ex. J).  The experimental study dates were February 26, 2009 to April 7, 2010, a period covering more than six months.  *Id.* at 17.  This pilot reproductive safety study served as a predicate for the pivotal reproductive safety study 671596/V-0084-0138 that began on June 28, 2011 (i.e., the study that FDA later used to determine the start of the testing phase for BRAVECTO).

111.    Study V-0084-0039, titled "Target Animal Safety Study of CBPI in Dogs Administered Orally on 3 Occasions 8 Weeks Apart" evaluated the safety of an oral BRAVECTO formulation in a pilot margin-of-safety study in puppies—i.e., a study regarding the safety of administering oral BRAVECTO to puppies.  Study V-0084-0039 Final Study Report, at 1, 20 (excerpt attached as Ex. K).  The experimental study dates were March 19, 2009 to March 31, 2010, a period covering more than six months.  *Id.* at 20.

112.    In light of the favorable data from earlier studies evaluating an oral formulation of BRAVECTO, Intervet submitted a request to establish an additional INAD for an oral formulation on February 17, 2010.

113.    Two days later, on February 19, 2010, FDA assigned INAD 11-903 for investigation of the oral formulation of BRAVECTO in dogs.  Letter from Tial Lian Thang, Center for Veterinary Medicine, FDA, to Intervet (Feb. 19, 2010) (attached as Ex. L).

114.    Intervet continued to conduct studies to evaluate the safety and efficacy of topical and oral formulations of BRAVECTO.  Intervet also shipped BRAVECTO into the United States for the purpose of lab-based testing under 21 C.F.R. § 511.1(a).

115.    For example, on February 19, 2010, Intervet filed a Notice of Intent to Import stating that BRAVECTO would enter United States interstate commerce on or about March 1, 2010, and that the product would bear the label, "Caution: Contains a new animal drug for

investigational use only in laboratory research animals or for tests in vitro. Not for use in humans," as required under 21 C.F.R. § 511.1(a). *See* Letter from Intervet to Melanie R. Berson, Center for Veterinary Medicine, FDA (Feb. 19, 2010) (attached as Ex. M).

116.   Similarly, Intervet shipped BRAVECTO to the United States for the purpose of lab-based testing for study S10036-00, titled "A study to evaluate the onset of activity of CBPI 28% spot-on solution for dogs against brown dog tick (*Rhipicephalus sanguineus*) and flea (*Ctenocephalides felis*) infestations of dogs." Study S10036-00 Final Study Report, at 1 (excerpt attached as Ex. N). The final study report for study S10036-00 states that the laboratory in Auburn, Alabama received BRAVECTO on October 29, 2010 and that the drug "was labeled with an investigational drug caution statement in accordance with 21 CFR 511.1(a)(1)." *Id.* at 11–12.

117.   On November 2, 2010, Intervet met with FDA to discuss the development plan for all three formulations of BRAVECTO (oral for dogs and topical for dogs and cats). During the meeting, FDA permitted Intervet to rely on data from efficacy studies conducted with the topical formulation to support development and approval of BRAVECTO's oral formulation.

118.   On November 1, 2012, Intervet submitted the Target Animal Safety Technical Section under INAD 11-903. This submission included the full study reports and detailed discussion of studies V-0084-0038 (pilot target animal reproductive safety study) and V-0084-0039 (pilot target animal margin-of-safety study) (discussed in ¶¶ 110–11 above). *See* TAS Technical Section Submission (excerpt attached as Ex. O). FDA issued a Target Animal Safety Technical Section Complete Letter on May 2, 2013.

119.   On February 13, 2013, Intervet submitted the Target Animal Effectiveness Technical Section under INAD 11-903. This submission included the full study reports as well as references to studies V-0084-0046 (dose/duration study of a topical BRAVECTO formulation)

and S10036 (study to evaluate the onset of activity of CBPI 28% spot-on solution for dogs) (discussed in ¶¶ 109, 116 above).  *See* Effectiveness Technical Section Submission at 7, 11, 21, 24 (excerpt attached as Ex. P).  FDA issued an Effectiveness Technical Section Complete Letter on March 19, 2014.

120.     On April 8, 2014, upon receiving the "complete letter" for the final component of the marketing application under INAD 11-903, Intervet submitted its administrative NADA for BRAVECTO (fluralaner) chewable tablets for dogs (later identified as NADA 141-426).

121.     On May 15, 2014, FDA approved NADA 141-426 and granted marketing approval for BRAVECTO (fluralaner) chewable tablets for dogs.

122.     Intervet began marketing BRAVECTO chewable tablets for dogs shortly after FDA issued its May 15, 2014 approval, and continues to market several BRAVECTO products today. Intervet derives substantial revenue from sales of BRAVECTO products, and that revenue is supported by the protection for BRAVECTO afforded by the '972 patent.  Nissan likewise derives revenue from sales of BRAVECTO products, from royalties that Intervet pays as part of the licensing agreement with Nissan.  Intervet continues to invest significantly in research and development for healthcare products for animals.

### C.     Patent Term Restoration Proceedings

123.     On July 10, 2014, Nissan timely applied to PTO for a restoration of the '972 patent's term to compensate for the time consumed by the BRAVECTO regulatory review period. In its application, Nissan addressed studies conducted with topical BRAVECTO formulations that informed the dosing determination for the oral formulation, and identified February 19, 2010, as the start of the regulatory review period's testing phase because FDA had assigned INAD number 11-903 for investigation of an oral BRAVECTO formulation (i.e., the first approved formulation)

on that date.  In submitting this application, Nissan reasonably relied on FDA's longstanding policy and regulatory review precedents establishing that the testing phase begins on the date that FDA assigns an INAD number.  *See supra* ¶¶ 53–77.  Further, because the '972 patent had been issued on February 16, 2010, Nissan could not have received patent term restoration for any part of the regulatory review period that occurred before that date (i.e., between August 16, 2007, when FDA assigned INAD numbers 11-656 and 11-658, and February 16, 2010).  *See* 35 U.S.C. § 156(c) (providing that patent term shall be restored only for the part of the regulatory review period that "occurs after the date the patent is issued").

124.    On April 20, 2015, PTO requested that FDA confirm that BRAVECTO had been subject to a regulatory review period within the meaning of 35 U.S.C. § 156(g).

125.    On October 19, 2015, FDA confirmed that BRAVECTO was subject to a regulatory review period.

126.    As required by 35 U.S.C. § 156, on November 3, 2016, PTO transmitted Nissan's application for patent term extension to FDA for that agency to determine the applicable regulatory review period for BRAVECTO.

127.    On March 23, 2017, FDA rejected Nissan's request to treat February 19, 2010, as the start of the testing phase for BRAVECTO because "FDA records indicate that the INAD effective date was August 4, 2011, which was the received date of the first submission that includes a study with substantial data (submission of a major health test) or the first submission containing a Notice of Claimed Investigational Exemption."  Letter from Janet Woodcock, Director, Center for Drug Evaluation and Research, FDA, to Hon. Michelle K. Lee, Under Secretary of Commerce and Director, U.S. Patent and Trademark Office 1 (Mar. 23, 2017) (attached as Ex. Q). Accordingly, FDA determined that the "total length of the regulatory review period for

BRAVECTO (fluralaner) is 1,017 days.  Of this time, 979 days occurred during the testing phase [i.e., between August 4, 2011 and April 8, 2014] and 38 days occurred during the approval phase." *Id*.

128.    A few months later, on February 12, 2018, FDA published notice of its BRAVECTO regulatory review period decision in the Federal Register.  83 Fed. Reg. 6,033, 6034 (Feb. 12, 2018).

129.    On April 12, 2018, Nissan timely requested that FDA reconsider and revise its decision regarding the BRAVECTO regulatory review period.  Nissan noted that it had previously "submitted February 19, 2010, as the start date for the testing phase"; that FDA had "dismissed this date without explanation"; and that Nissan "believes this date is consistent with" FDA's past decisions.  Letter from Cary Miller, Partner, Jones Day, to Division of Docket Management, FDA (Apr. 12, 2018) ("Request for Revision"), at 5 (attached as Ex. R).

130.    On April 12, 2021, FDA "reaffirm[ed] [its] determination that the testing phase did not begin on February 19, 2010" for BRAVECTO.  Letter from Patricia A. Cavazzoni, Acting Director, Center for Drug Evaluation and Research, to Cary Miller, Partner, Jones Day (Apr. 12, 2021) at 3 n.1 (attached as Ex. S).  Although "FDA acknowledged the submission of a request to open an INAD file for this drug on February 19, 2010, and [Nissan's] original PTE application asserted the testing phase started on this date, which [Nissan] described as the 'effective date that INAD 011-903 was granted,'" FDA asserted that it "generally considers the opening of an INAD file as a housekeeping matter and that the INAD file does not become effective with the simple opening of a file."  *Id*.  "At the time [21 C.F.R.] § 60.22(d) was originally issued," FDA stated, "an INAD file was established when we received the first NCIE.  Since that time, the opening of an INAD file does not always coincide with the receipt of the first NCIE."  *Id*.  FDA decided to

"use[] the submission of the first NCIE to determine the effective date for the INAD.  In the case of BRAVECTO, the first NCIE was received August 4, 2011, and so FDA reaffirms this date as the effective date of the INAD."  *Id.* at 3.  FDA nevertheless agreed that "the determination of the regulatory review period as published should be revised and recalculated using June 28, 2011, the date a major health or environmental effects test began, as the start of the testing phase."  *Id.* at 4.  FDA's determination that pivotal reproductive safety study 671596 beginning on June 28, 2011 qualified as a major health or environmental effects test was based "on the available information from the CVM reviews," and FDA made clear that the agency had "carefully reviewed its records."  *Id.* at 3–4.

131.    On June 11, 2021, FDA published notice of its revised decision in the Federal Register.  *See* 86 Fed. Reg. 31,318 (June 11, 2021) ("Final Determination").

132.    On February 17, 2022, FDA sent a letter communicating its Final Determination for BRAVECTO to PTO, which will use FDA's calculation of the regulatory review period to adjudicate Nissan's request for a restoration of the '972 patent's term.  Letter from Patricia A. Cavazzoni, Director, Center for Drug Evaluation and Research, FDA, to Andrew Hirshfield, Commissioner for Patents (Feb. 17, 2022) (attached as Ex. T).  As of the date of this Complaint, PTO has not issued a final certificate of extension for the '972 patent.

133.    In the February 17, 2022 letter, FDA confirmed that it considered its June 11, 2021 "determination of the regulatory review period to be final."  *Id.*; *see also* 21 C.F.R. § 60.26(b)(2).

134.    In light of the above, Plaintiffs have exhausted all of their available administrative remedies with respect to FDA's regulatory review period determination.

## CLAIMS FOR RELIEF

### COUNT I: Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### (Agency Action Taken In Excess of Statutory Jurisdiction or Authority; Arbitrary and Capricious Action)

135.    Plaintiffs incorporate by reference paragraphs 1–134 as if fully set forth herein.

136.    The APA provides that the Court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

137.    FDA is an "agency" under the APA, 5 U.S.C. § 551(1), and the regulatory review period determination is a final, reviewable "agency action for which there is no other adequate remedy in a court," 5 U.S.C. §§ 551(13), 704; *see also Astra*, 71 F.3d at 1578–79 (PTO "is not authorized to redetermine or set aside the [regulatory review] period determined by the [FDA]."). FDA's regulatory review period determination for BRAVECTO is final agency action subject to review under the APA.  5 U.S.C. § 704.  It represents the consummation of FDA's decisionmaking process with respect to the regulatory review period for BRAVECTO.  And it affects Plaintiffs' legal rights and obligations because FDA's regulatory review period determination will result in a shorter restoration of the '972 patent than if FDA's action had not been arbitrary, capricious, and contrary to law.

138.    Under the exemption prong of the 1988 Restoration Act, the testing phase of the regulatory period must begin no later than "the date an exemption under [21 U.S.C. § 360b(j)] became effective for the approved new animal drug product."  35 U.S.C. § 156(g)(4)(B)(i).

139.    Under 21 C.F.R. § 511.1(a), "[n]ew animal drugs" used "for tests in vitro and in laboratory research animals" are automatically exempt as long as they comply with certain

labeling, due diligence, and recordkeeping requirements.  These requirements do not include submission of a notice of claimed investigational exemption for a new animal drug to FDA. Accordingly, "an exemption" for lab-based testing under 21 C.F.R. § 511.1(a) may become "effective" *without* the filing of a notice of claimed investigational exemption for a new animal drug.

140.    FDA's patent term restoration regulation disregards that aspect of the governing legal framework.  Specifically, under the exemption prong of the regulation, FDA determines the start of the testing phase based exclusively on "the date on which the agency acknowledge[d] the filing of a notice of claimed investigational exemption for a new animal drug."  21 C.F.R. § 60.22(d).

141.    That approach is contrary to the statute.  *See, e.g.*, *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) ("Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer.").  By enacting the 1988 Restoration Act, Congress mandated that the regulatory review period for a new animal drug must begin no later than the date "an exemption" under 21 U.S.C. § 360b(j) "became effective" for the relevant animal drug product.  35 U.S.C. § 156(g)(4)(B)(i).  An exemption for lab-based research under 21 C.F.R. § 511.1(a) is such an exemption, and it does not require the submission of a "notice of claimed investigational exemption for a new animal drug."  *See* 21 C.F.R. § 511.1(a).  But the exemption prong of FDA's patent term restoration regulation nevertheless requires the submission of a "notice of claimed investigational exemption for a new animal drug" —a step necessary only for the *clinical* research exemption under 21 C.F.R. § 511.1(b)—in order to start the clock on the regulatory review period.

*See* 21 C.F.R. § 60.22(d).  FDA's method thus deprives drug sponsors of restored patent term they are due under the plain terms of the 1988 Restoration Act.

142.    Further, FDA's interpretation of the 1988 Restoration Act is not entitled to deference because it is inadequately explained.  The agency has never offered a reasoned justification for *why* the start of the testing phase of the regulatory review period should be tied to the agency's acknowledgment of a "notice of claimed investigational exemption for a new animal drug," 21 C.F.R. § 60.22(d), or *why* the start of the testing phase should be tied only to the effectiveness of a clinical exemption under 21 C.F.R. § 511.1(b) as opposed to the effectiveness of a lab-based exemption under 21 C.F.R. § 511.1(a).  Because FDA has failed to offer a reasoned justification for its regulation, its interpretation of the patent term restoration statute is not entitled to deference.  *See, e.g.*, *Michigan v. EPA*, 576 U.S. 743, 754 (2015).  Any attempt by FDA to justify its interpretation decades later would be an impermissible *post hoc* rationalization.  *See SEC v. Chenery Corp.*, 332 U.S. 194 (1947).

143.    FDA applied its invalid regulation, 21 C.F.R. § 60.22(d), in the patent term restoration proceedings challenged here.  For example, in its initial regulatory review period determination, FDA concluded that August 4, 2011 was the start of the testing phase because it was "the date on which the Agency acknowledged the filing of a notice of claimed investigational exemption for a new animal drug."  83 Fed. Reg. at 6,034.  And in FDA's April 12, 2021 letter,

which addressed Nissan's request for revision, FDA stated that "the first NCIE was received August 4, 2011, and so FDA reaffirms this date as the effective date."

144.    But that date—August 4, 2011—was well after "an exemption" became "effective" under 35 U.S.C. § 156(g)(4)(B)(i).  That is so because an exemption for *lab-based* research under 21 C.F.R. § 511.1(a) became effective at least as early as 2010.

145.    Indeed, on February 19, 2010, Intervet submitted a notice of intent to import BRAVECTO into the United States for research purposes.  This notice cited 21 C.F.R. § 511.1(a), and stated that "[t]he investigational new animal drug will be labeled in accordance with" 21 C.F.R. § 511.1(a).  The notice quoted verbatim the same labeling language that is included in the text of the regulation, and which triggers application of the lab-based testing exemption.  *See* 21 C.F.R. § 511.1(a)(1) (providing that "[a] shipment or other delivery of a new animal drug . . . intended solely for tests in vitro or in animals used only for laboratory research purposes *shall be exempt . . . if it is labeled as follows*: Caution. Contains a new animal drug for investigational use only in laboratory research animals or for tests in vitro. Not for use in humans." (emphasis added)).

146.    Similarly, Intervet shipped BRAVECTO into the United States for the purpose of lab-based testing under 21 C.F.R. § 511.1(a) for study S10036-00 conducted in Auburn, Alabama.  Study S10036-00's final study report states that BRAVECTO "was labeled with an investigational drug caution statement in accordance with 21 CFR 511.1(a)(1)" and that the laboratory received the shipment of BRAVECTO on October 29, 2010, demonstrating that the product entered United States interstate commerce on or before that date.

147.    Further, FDA had been conducting regulatory review of BRAVECTO even before February 2010.  On August 6, 2007, Intervet submitted to FDA a request to establish an INAD file

to pursue development of BRAVECTO in cats and dogs.  On August 16, 2007, FDA assigned INAD 11-656 for investigation of BRAVECTO in dogs and INAD 11-658 for investigation of BRAVECTO in cats.  Intervet and FDA also held multiple meetings between 2007 and February 2010 to discuss the development, testing, and review of BRAVECTO.  *See supra* ¶ 107.

148.    In short, because 21 C.F.R. § 60.22(d) contradicts the plain terms of the 1988 Restoration Act, and because FDA never provided a reasoned justification for the regulation's underinclusive approach, the regulation (and the FDA regulatory review period determination which relied upon that regulation here) must be held unlawful and set aside.  *See* 5 U.S.C. § 706(2). The Court should therefore vacate FDA's Final Determination and remand this proceeding to FDA for recalculation of the testing phase under a proper interpretation of the statute.

## COUNT II: Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (Arbitrary and Capricious Action; Inadequately Explained Change in Policy and Precedent)

149.    Plaintiffs incorporate by reference paragraphs 1–148 as if fully set forth herein.

150.    The APA provides that a court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

151.    Under FDA's longstanding policy and regulatory review precedents, the testing phase for BRAVECTO would have started on February 19, 2010, because FDA assigned INAD number 11-903 to BRAVECTO on that date, and because FDA would have treated Intervet's request to establish an INAD as a "notice of claimed investigational exemption for a new animal drug" under FDA's regulations.  Therefore, FDA should have considered February 19, 2010 as the

effective date of the exemption under FDA's regulations because the agency acknowledged the filing of a notice of claimed investigational exemption for the new animal drug on that date.

152.    In determining the regulatory review period for BRAVECTO, however, FDA departed from its longstanding policy and regulatory review precedents.  Instead, FDA concluded that the testing phase begins on the date that the sponsor first submits an NCIE form, not the date that FDA assigns an INAD number to the drug.  FDA's Final Determination thus conflicts with the agency's longstanding policy and regulatory review precedents linking the start of the testing phase to the date on which the agency assigned an INAD number.

153.    FDA acted arbitrarily and capriciously by failing to acknowledge or explain the agency's departure from its longstanding policy and practice of using the INAD date as the start of the testing phase.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("When an agency changes its existing position, it . . . must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009))).

154.    FDA failed to display awareness of its departure from its former policy and practice, under which the testing phase began on "the effective date for a notice of claimed investigational exemption for a new animal drug (INAD)" and "the date on which the agency acknowledges the filing of an INAD … constitute[d] the 'effective date' for an INAD."  56 Fed. Reg. at 5,786.  Nor did FDA display awareness of its departure from its 2002 Guidance for Industry, which the agency reaffirmed in 2015 and 2018, providing that the testing phase begins

"when the sponsor submits a request to CVM to establish an INAD file." 2002 Guidance at 7; *see also* 2015 Guidance at 10; 2018 Guidance at 11.

155.    Similarly, FDA did not provide a reasoned explanation for why it abandoned its longstanding policy, or why the agency no longer treats an INAD application as a notice of claimed investigational exemption for a new animal drug.  FDA also failed to consider an important aspect of the problem—i.e., how FDA's policy change would affect patent terms by shortening regulatory review periods, contrary to the 1988 Restoration Act's purposes.  In making this policy shift, FDA failed to take into account drug sponsors' serious reliance interests in the agency's longstanding policy that resulted in regulatory review periods—and thus patent terms—consistent with 35 U.S.C. § 156 and 21 C.F.R. § 60.22(d)(1); *see also* 34 Cong. Rec. 30,272 (1988) (statement of Sen. Hatch) (observing that under the 1988 Restoration Act, "developers of new animal drugs will be able to recoup more of their research and development costs"); 134 Cong. Rec. 30,560 (1988) (statement of Rep. Waxman) (noting that the 1988 Restoration Act ensures that "animal drug companies" are "assured of additional market time to recoup their investments").

156.    FDA also acted arbitrarily and capriciously because the agency departed from its regulatory review precedents without acknowledgement or sufficient explanation.  In at least sixteen regulatory review period determinations issued between 1990 and 2007, FDA used the date that the agency assigned an INAD number as the start of the testing phase.  *See supra* ¶¶ 59–74. Under those precedents, FDA should have used February 19, 2010, as the start of the testing phase for BRAVECTO because FDA assigned INAD number 11-903 to BRAVECTO on that date.  But

FDA failed to acknowledge or address these contrary precedents in its Final Determination for BRAVECTO.

157. For similar reasons, FDA acted arbitrarily and capriciously by treating BRAVECTO differently than similarly situated animal drugs for which FDA used the INAD date as the start of the regulatory review period's testing phase. BRAVECTO is similarly situated to the sixteen prior regulatory review precedents in which FDA used the INAD date as the start of the testing phase for the new animal drugs. *See supra* ¶¶ 59–74. FDA treated BRAVECTO differently than these animal drugs because the agency used the INAD date as the start of the testing phase in its prior decisions, but refused to use the INAD date as the start of the testing phase in the case of BRAVECTO. FDA never provided a reasoned explanation for treating BRAVECTO differently than these similarly situated animal drugs. By granting many other sponsors the benefit of the INAD date, but refusing to follow that practice in the case of BRAVECTO, FDA unreasonably failed to treat similarly situated parties similarly. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.").

158. More broadly, FDA acted arbitrarily and capriciously because it failed to reasonably explain its Final Determination for BRAVECTO. Although FDA stated in its April 12, 2021 letter that it used the INAD date when 21 C.F.R. § 60.22(d)(1) "was originally issued" in 1992, FDA continued using the INAD date as the start of the testing phase for fifteen years after the rule was promulgated. In the Final Determination at issue here, FDA did not explain what it meant when it noted in the letter that the agency "generally" treats the establishment of an INAD

46

as a "housekeeping matter."  Nor did FDA explain why that characterization means that an INAD application is not treated as "a notice of claimed investigational exemption for a new animal drug," under what circumstances the INAD date is not treated as a housekeeping matter, or why the INAD date was not treated as a housekeeping matter in its earlier regulatory review precedents involving similarly situated animal drugs.  FDA's failure to address these important aspects of the problem renders its final decision arbitrary and capricious under the APA.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  FDA has compounded these errors by applying shifting and inconsistent approaches to regulatory review period determinations since 2007.

159.    This Court should hold unlawful and set aside FDA's Final Determination because it is arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).

## COUNT III: Violation of Due Process and Administrative Procedure Act, 5 U.S.C. § 706(2)
### (Action Contrary to Law; Violation of Due Process Required by Law)

160.    Plaintiffs incorporate by reference paragraphs 1–159 as if fully set forth herein.

161.    A court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(A), (B).

162.    The Fifth Amendment's Due Process Clause states: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

163.    "Traditional concepts of due process incorporated into administrative law preclude an agency from" depriving a party of property or otherwise penalizing a party for violating a rule "without first providing adequate notice of the substance of the rule."  *Satellite Broad. Co. v. FCC*,

824 F.2d 1, 3 (D.C. Cir. 1987); *see also SNR Wireless LicenseCo, LLC v. FCC,* 868 F.3d 1021,

1046 (D.C. Cir. 2017); *United States v. Chrysler Corp.*, 158 F.3d 1350 (D.C. Cir. 1998).

164.     Plaintiffs have a legally protected property interest in the '972 patent, including the

term of that patent. *See, e.g.*, *Horne*, 576 U.S. at 359.

165.     FDA failed to provide Plaintiffs with fair notice of the policy that FDA would use

to determine the start of the regulatory review period's testing phase for BRAVECTO.  FDA

confusingly used two different acronyms, INAD and NCIE, to refer to a "notice of investigational

exemption for a new animal drug" as the term is used in FDA's regulations.  Moreover, FDA

confusingly used the same terminology—"effective date for the INAD"—both before and after the

2009 policy change.  *Compare* 55 Fed. Reg. 9,773, 9,773 (1990) (Dormosedan), *with* 74 Fed. Reg.

6,639, 6,640 (2009) (Vetmedin).  Through its public statements and regulatory review precedents,

FDA led Plaintiffs to believe that filing an INAD application sufficed to start the testing phase.

166.     However, in 2009, FDA abruptly changed course.  Without acknowledging or

adequately explaining the departure—or indeed, even making clear what policy it was applying—

FDA began declining to tie the start of the testing phase to the acknowledgment of an INAD

application.  *See supra* ¶¶ 78–93.  For example, FDA did not clearly announce its policy shift in

the Federal Register or provide any notice of that change to animal drug sponsors in guidance for

industry.

167.     FDA never disavowed its statements in the 1991 preamble published in the Federal

Register that the testing phase begins on "the effective date for a notice of claimed investigational

exemption for a new animal drug (INAD)" and that "the date on which the agency acknowledges

the filing of an INAD should constitute the 'effective date' for an INAD."  56 Fed. Reg. at 5,786.

Nor did the agency withdraw its 2002 Guidance or repudiate its regulatory review precedents

published in the Federal Register from 1990 to 2007 holding that the testing phase starts when FDA assigns an INAD number.

168.    Indeed, FDA actively misled members of industry, including Plaintiffs.  Even after FDA changed its practice, FDA still took the position in subsequent guidance for industry published in 2015 and 2018 that the testing phase "begins when the sponsor submits a request to CVM to establish an INAD file."  2015 Guidance at 10; 2018 Guidance at 11.  Despite making this change, FDA never abandoned the use of the "INAD" acronym in its regulatory review precedents. *See, e.g.*, 74 Fed. Reg. 6,639, 6,640 (2009); 83 Fed Reg. 6,577, 6,579 (2018).  With these inconsistent statements and guidance, FDA not only failed to provide fair notice to Plaintiffs of when the testing phase would begin (and what steps they would need to take to trigger the start of the testing phase), but FDA misled Plaintiffs into believing that submission of an INAD application for BRAVECTO was sufficient to start the testing phase.

169.    In light of the agency's inconsistent statements and guidance, Plaintiffs could not have determined with ascertainable certainty that FDA would reject the date that FDA assigned an INAD number to BRAVECTO as the start of the testing phase for BRAVECTO.  Plaintiffs reasonably interpreted the 1991 preamble published in the Federal Register, FDA's regulatory review precedents published in the Federal Register, and FDA's 2002 Guidance for Industry as reflecting the agency's policy that the testing phase for BRAVECTO would begin on the date that FDA assigned an INAD number to BRAVECTO.  Indeed, the 2002 Guidance states that it reflects FDA's "current thinking" on this topic.  2002 Guidance at 2.  Even after FDA began rejecting the INAD date as the proper start of the testing phase, FDA never acknowledged that change or explained it in any of its regulatory review precedents available in the Federal Register or in any guidance for industry.  The first (and only) time that FDA used the term "NCIE" in its regulatory

review precedents was in 2012—two years *after* FDA had assigned INAD number 11-903 to BRAVECTO.  77 Fed. Reg. at 26,557.  Plaintiffs reasonably understood that by submitting an INAD application in February 2010 that they were triggering the start of the testing phase consistent with FDA's longstanding policy and practice.  Even in its Final Determination for BRAVECTO, FDA referred to the "effective date for the INAD," the same language the agency had consistently used when starting the testing phase with the INAD date.  Plaintiffs' reasonable expectation that FDA would use the INAD date comported with the Federal Circuit's contemporaneous pronouncement that the testing phase began when "FDA established an INAD file."  *Wyeth*, 603 F.3d at 1295.

170.    FDA's failure to provide fair notice of the policy that it would use to determine the start of the BRAVECTO regulatory review period caused prejudice to Plaintiffs.  If FDA had given fair notice that the submission of an NCIE form for BRAVECTO (or some other action) was required to start the testing phase (and that the filing of an INAD application would not suffice), Plaintiffs could have adjusted the timing of the relevant submissions to FDA to trigger the start of the testing phase at an earlier date—for example, by submitting a separate NCIE form to FDA contemporaneously with the INAD application in February 2010.

171.    Despite the lack of fair notice regarding the policy that would apply to BRAVECTO, FDA penalized Plaintiffs by shortening the drug's regulatory review period because Plaintiffs did not submit an NCIE form with the INAD application in February 2010.  FDA's Final Determination will deprive Plaintiffs of property and cost Plaintiffs millions of dollars in lost revenue from BRAVECTO because the decision shortens the drug's exclusivity period enforceable during the '972 patent's term.  Had FDA followed its longstanding policy and practice by using the INAD assignment date as the start of the testing phase, Plaintiffs would benefit from millions

of dollars in additional sales of BRAVECTO during the exclusivity period of the '972 patent's term.

172.    FDA deprived Plaintiffs of their legally protected property interest in the '972 patent, including the restored term of that patent, without satisfying the requirements of due process, by failing to provide fair notice of the regulatory review policy that would apply to BRAVECTO.

173.    This Court should hold unlawful and set aside FDA's Final Determination because it is arbitrary and capricious, contrary to law, and contrary to constitutional right.  *See* 5 U.S.C. § 706(2)(A), (B).

### COUNT IV: Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (Arbitrary and Capricious Action; Decision Contrary to the Record)

174.    Plaintiff incorporates by reference paragraphs 1–173 as if fully set forth herein.

175.    The APA provides that a court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43 (agency action arbitrary and capricious where agency "offer[s] an explanation for its decision that runs counter to the evidence").

176.    Under the major test prong of 35 U.S.C. § 156(g)(4)(B)(i), the testing phase of the regulatory period begins no later than "the date a major health or environmental effects test on the drug was initiated."   A study must satisfy three requirements to qualify as a "major health or environmental effects test": (1) the study must be "reasonably related to the evaluation of the health or environmental effects of a product," (2) "the data from" the study must be "submitted to receive permission for commercial marketing or use," and (3) the study must "require[] at least six months to conduct," exclusive of "[p]eriods of analysis or evaluation of test results."   35 U.S.C. § 156(f)(3); *see also* 21 C.F.R. § 60.22(e) (similar definition under implementing regulation).

177.    During FDA's reconsideration of BRAVECTO's regulatory review period, FDA determined that reproductive safety study 671596 qualified as a "major health or environmental effects test," and FDA thus revised the testing phase start date to June 28, 2011, the date that the study began.  FDA based its determination "on the available information from the CVM reviews," and made clear that it had "carefully reviewed its records."  Letter from Patricia A. Cavazzoni, Acting Director, Center for Drug Evaluation and Research, to Cary Miller, Partner, Jones Day (Apr. 12, 2021) at 3–4 (attached as Ex. S).  In doing so, FDA acted arbitrarily and capriciously by overlooking several other "major health or environmental effects tests" submitted in support of NADA 141-426 that began before June 28, 2011.

178.    Study V-0084-0046, titled "Study to evaluate the efficacy, the cosmetic effects and the tolerance of a CBPI spot-on solution administered once topically at a dose of 50, 40, 30, 20, 10, or 0 mg/kg body weight against ticks (*Ixodes ricinus*) and/or fleas (*Ctenocephalides felis*) on dogs," evaluated the efficacy of a topical BRAVECTO formulation at different doses.  The experimental study dates were October 13, 2008 to June 3, 2009, and this study was submitted as part of the Target Animal Effectiveness Technical Section under INAD 11-903/NADA 141-426 that led to approval of BRAVECTO chewable tablets for dogs.

179.    Study V-0084-0038, titled "CBPI: Pilot target animal reproductive safety study in the dog," evaluated the reproductive safety of an oral BRAVECTO formulation.  The experimental study dates were February 26, 2009 to April 7, 2010, and this study was submitted as part of the Target Animal Safety Technical Section under INAD 11-903/NADA 141-426 that led to the approval of BRAVECTO chewable tablets for dogs.  Moreover, this pilot reproductive safety study served as a predicate for pivotal reproductive safety study 671596, which FDA deemed to qualify

as a "major health or environmental effects test" during its reconsideration of BRAVECTO's regulatory review period.

180.    Study V-0084-0039, titled "Target animal safety study of CBPI in dogs administered orally on 3 occasions 8 weeks apart," evaluated the safety of an oral  BRAVECTO formulation in a pilot margin-of-safety study in puppies.  The experimental study dates were March 19, 2009 to March 31, 2010, and this study was submitted as part of the Target Animal Safety Technical Section under INAD 11-903/NADA 141-426 that led to the approval of BRAVECTO chewable tablets for dogs.

181.    These tests (V-0084-0038, V-0084-0039, V-0084-0046) satisfy all of the requirements of a "major health or environmental effects test" because they were (1) closely related to evaluation of BRAVECTO's health effects, (2) submitted as part of the BRAVECTO INAD 11-903/NADA 141-426, and (3) were conducted over a period of at least six months, excluding post-testing analysis.  In conjunction with other elements of the patent term restoration statute, *see, e.g.*, 35 U.S.C. § 156(c) (providing that patent term shall be restored only for regulatory review that "occurs after the date the patent is issued"), these tests support a start date for BRAVECTO's testing phase no later than February 19, 2010.

182.    FDA's determination that the testing phase began on June 28, 2011 was therefore arbitrary, capricious, and contrary to the record.  *See* 5 U.S.C. § 706(2).

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that the Final Determination exceeded FDA's authority and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706;

B.  Set aside and vacate FDA's Final Determination on that basis;

C.  Issue an order remanding this proceeding to FDA and directing FDA to recalculate the regulatory review period based on the date the testing phase began under 35 U.S.C. § 156(g)(4)(B);

D.  Issue an order directing PTO to issue a final certificate of extension for the '972 patent based on FDA's recalculated regulatory review period in a manner consistent with the law, or, alternatively, if such certificate of extension has already issued, revise or reissue the final certificate of extension for the '972 patent to reflect the recalculated regulatory review period;

E.  Grant Plaintiffs recovery of their fees, costs, and expenses incurred in connection with this litigation, as authorized by 28 U.S.C. § 2412; and

F.  Award any other relief the Court deems just and proper.

<table>
<tr><td>/s/ <i>Brett A. Shumate</i></td><td>/s/ <i>Kevin F. King</i></td></tr>
<tr><td>Brett A. Shumate (D.C. Bar No. 974673)</td><td>Kevin F. King (D.C. Bar No. 1012403)</td></tr>
<tr><td>Colleen M. Heisey (D.C. Bar No. 482406)</td><td>Natalie M. Derzko (D.C. Bar No. 459564)</td></tr>
<tr><td>JONES DAY</td><td>Daniel G. Randolph (D.C. Bar No. 230150)</td></tr>
<tr><td>51 Louisiana Avenue, N.W.</td><td>Annie X. Wang (D.C. Bar No. 1032637)</td></tr>
<tr><td>Washington, D.C.  20001</td><td>COVINGTON & BURLING LLP</td></tr>
<tr><td>Telephone:  (202) 879-3939</td><td>One CityCenter</td></tr>
<tr><td>Facsimile:  (202) 626-1700</td><td>850 Tenth Street NW</td></tr>
<tr><td></td><td>Washington, DC 20001</td></tr>
<tr><td>Anthony M. Insogna (D.C. Bar No. 450366)</td><td>Telephone: (202) 662-5488</td></tr>
<tr><td>Cary Miller, Ph.D. (<i>pro hac vice</i> forthcoming)</td><td>Facsimile: (202) 778-5488</td></tr>
<tr><td>JONES DAY</td><td></td></tr>
<tr><td>4665 Executive Drive, Suite 1500</td><td><i>Counsel for Plaintiffs Intervet Inc. d/b/a Merck</i></td></tr>
<tr><td>San Diego, CA 92121</td><td><i>Animal Health, Intervet International B.V.</i></td></tr>
<tr><td>Telephone:  (858) 314-1200</td><td><i>d/b/a MSD Animal Health, and Merck Sharp &</i></td></tr>
<tr><td>Facsimile:  (844) 345-3178</td><td><i>Dohme LLC</i></td></tr>
</table>

*Counsel for Plaintiff Nissan Chemical Corporation*

June 6, 2022