UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NISSAN CHEMICAL )
CORPORATION, *et al.*, )
 )
    **Plaintiffs,** )
 )
v. ) Civil Case No. 22-1598 (RJL)
 )
U.S. FOOD AND DRUG )
ADMINISTRATION, *et al.*, )
 )
    **Defendants.** )

## MEMORANDUM OPINION
(August 8th, 2024) [Dkt. ##40, 42]

Nissan Chemical Corporation, Intervet, Inc., Intervet International B.V., and Merck Sharp & Dohme LLC (collectively, "plaintiffs") bring this action against defendants U.S. Department of Health and Human Services, U.S. Food and Drug Administration, and others (together, "FDA") under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), seeking a longer patent term extension for their animal drug product than that which the FDA has provided. Pending before the Court are plaintiffs' Motion for Summary Judgment [Dkt. #40] and the FDA's Cross-Motion for Summary Judgment [Dkt. #42]. For the reasons discussed below, the Court will GRANT plaintiffs' Motion for Summary Judgment and DENY the FDA's Cross-Motion for Summary Judgment on the basis that the FDA's determination of the regulatory review period for the drug at issue was arbitrary and capricious and violated due process principles because the FDA changed its methodology for determining a drug's regulatory

1

review period without acknowledging that it was doing so or providing fair notice to plaintiffs.

I. **BACKGROUND**

a. Statutory and Regulatory Background

The Food, Drug, and Cosmetic Act ("FDCA") requires that new animal drugs be tested, reviewed, and approved by the FDA before they may be commercially marketed. *See* 21 U.S.C. § 301 *et seq.* In 1988, Congress observed that "animal drug innovators typically lose years of patent protection because of the FDA's scientific testing requirements and regulatory review," which "can have the effect of reducing incentives to develop new animal drugs." H.R. Rep. No. 100-972, pt. 1, at 3 (1988). To address this concern, Congress enacted the Generic Animal Drug and Patent Restoration Act of 1988, Pub. L. No. 100-670, 102 Stat. 3971 (1988), which extends the term of a patent covering an animal drug for up to five years to account for time the drug was subject to testing and regulatory review by the FDA. *See* 35 U.S.C. § 156(a), (g)(4), (g)(6)(A).

To obtain such a patent term extension, the patent owner must submit an application to the Patent & Trademark Office ("PTO") within 60 days of receiving marketing approval from the FDA. *Id.* § 156(d)(1). The FDA is then responsible for determining the applicable "regulatory review period" for the drug product covered by the relevant patent, which is in turn used to calculate the patent term extension. *Id.* § 156(d)(2)(A); *see also id.* § 156(c).

The regulatory review period is comprised of two components: the "testing" phase and the "approval" phase. *Id.* § 156(g)(4)(B); *see also* 21 C.F.R. § 60.22(d). By statute,

the testing phase begins on the "earlier" of two potential dates: (1) "the date a major health or environmental effects test on the drug was initiated"; or (2) "the date an exemption under [21 U.S.C. § 360b(j)] became effective for the approved new animal drug product." 35 U.S.C. § 156(g)(4)(B)(i). In turn, 21 U.S.C. § 360b(j) delegates authority to the FDA to "promulgate regulations for exempting" new animal drugs from other safety restrictions while the drugs are being used "solely for investigational use" to evaluate their "safety and effectiveness." 21 U.S.C. § 360b(j). As relevant here, the FDA has promulgated two types of animal drug exemptions under § 360b(j). First, under 21 C.F.R. § 511.1(a), new animal drugs "intended solely for tests in vitro or in animals used only for laboratory research purposes"—*i.e.,* lab-based testing—are automatically exempt so long as the sponsor complies with certain labeling, due diligence, and recordkeeping requirements. 21 C.F.R. § 511.1(a). Second, under 21 C.F.R. § 511.1(b), new animal drugs "intended for clinical investigational use in animals"—*i.e.,* clinical trial testing—are exempt if the sponsor complies with a different set of labeling, due diligence, and recordkeeping requirements. 21 C.F.R. § 511.1(b). A key difference between the lab-based testing exemption and the clinical trial testing exemption is that the latter requires that "[p]rior to shipment of the new animal drug for clinical tests in animals, the sponsor of the investigation shall submit in triplicate to FDA a 'Notice of Claimed Investigational Exemption for a New Animal Drug' including" specified information about the new animal drug and the anticipated clinical testing. *Id.* § 511.1(b)(4). The lab-based testing exemption does not include such a requirement. *See* 21 C.F.R. § 511.1(a).

3

The FDA's patent term restoration regulation, 21 C.F.R. § 60.22, provides further guidance regarding the "definitions of the testing phase and the approval phase" that the FDA will use in determining a product's regulatory review period. 21 C.F.R. § 60.22. For animal drugs:

> The testing phase begins on the date a major health or environmental effects test[1] is begun or the date on which the agency acknowledges the filing of a notice of claimed investigational exemption for a new animal drug, whichever is earlier, and ends on the date a marketing application under section 512 of the Act is initially submitted to FDA.

*Id.* § 60.22(d)(1). "The approval phase begins on the date a marketing application under section 512 of the Act is initially submitted to FDA and ends on the date the application is approved." *Id.* § 60.22(d)(2). Subject to specified caps and adjustments, the lengths of the testing and approval phases determine the length of the patent term extension. *See* 35 U.S.C. § 156(c), (g)(6).

### b. Factual and Procedural Background

At issue here is the appropriate start date of the testing phase for the animal drug BRAVECTO, a medicine used to treat and prevent flea and tick infestations in dogs. *See* First Am. Compl. for Declaratory and Injunctive Relief [Dkt. #37] ("Am. Compl.") ¶¶ 1–2. Nissan Chemical Corporation ("Nissan") owns the patent for BRAVECTO's active ingredient, fluralaner, and Intervet, Inc. ("Intervet") is the licensed commercial sponsor

---

[1] A "major health or environmental effects test" is defined as any test which: "(1) Is reasonably related to the evaluation of the product's health or environmental effects, or both: (2) Produces data necessary for marketing approval; and (3) Is conducted over a period of no less than 6 months duration, excluding time required to analyze or evaluate test results." 21 C.F.R. § 60.22(e).

of BRAVECTO products. *Id.* at ¶¶ 103–06; *see also* Administrative Record ("A.R.") 1441.

Nissan first began developing BRAVECTO as a topical medicine for use in dogs and cats. Am. Compl. ¶ 109; Defs.' Answer to Plaintiffs' First Am. Compl. [Dkt. #38] ("Answer") ¶ 109. In August 2007, Intervet submitted a request to the FDA to establish an Investigational New Animal Drug ("INAD") file to pursue this development, and the FDA assigned INAD 11-656 for the investigation of BRAVECTO in dogs and INAD 11-658 for the investigation of BRAVECTO in cats. Am. Compl. ¶¶ 108–09; Answer ¶¶ 108–09. Intervet later decided to also pursue the development of an oral formulation of BRAVECTO, and on February 17, 2010, Intervet submitted a request to the FDA to establish an additional INAD file for this oral formulation. Am. Compl. ¶ 115; Answer ¶ 115. On February 19, 2010, the FDA "acknowledged receipt" of Intervet's submission and assigned INAD number 11-903 for the investigation of an oral formulation of BRAVECTO for use in dogs. A.R. 1744. After conducting multiple studies on the safety and efficacy of the drug, Intervet filed a new animal drug application ("NADA") with the FDA on April 8, 2014, seeking authorization for the commercial marketing and use of the oral formulation of BRAVECTO in dogs. A.R. 1384–1425; *see also* A.R. 1835. On May 15, 2014, the FDA approved Intervet's application. A.R. 1384; *see also* A.R. 1835.

Although Intervet did not receive approval to commercially market BRAVECTO until May 2014, the patent for the active ingredient in BRAVECTO, U.S. Patent No. 7,662,972 ("the '972 patent"), was issued on February 16, 2010. A.R. 1441. In July 2014, Nissan therefore submitted a patent term restoration application to the PTO,

seeking to have the term of the '972 patent extended to account for the multi-year regulatory review period. A.R. 1330. In that application, Nissan claimed February 19, 2010—the date INAD 11-903 was assigned for investigation of the oral formulation of the drug—as the start of the "testing phase" under 35 U.S.C. § 156(g)(4)(B)(i). *See* A.R. 1381. After an initial review, the PTO forwarded Nissan's application to the FDA for a determination of the applicable regulatory review period. A.R. 1329.

In its initial decision, published in February 2018, the FDA instead determined that August 4, 2011 was the start of the testing phase. A.R. 1835. The FDA explained:

> The applicant claims February 19, 2010, as the date the investigational new animal drug application (INAD) became effective. However, FDA records indicate that the INAD effective date was August 4, 2011, which was the date a major health or environmental effects test was begun or the date on which the Agency acknowledged the filing of a notice of claimed investigational exemption for a new animal drug, whichever was earlier.

A.R. 1835. The FDA agreed with Nissan's determination of the approval phase, which lasted from April 8, 2014 to May 15, 2014. *Id.*; *see also* A.R. 1381.

In April 2018, Nissan submitted a request for revision of the FDA's regulatory review period determination, as permitted by 21 C.F.R. § 60.24(a). A.R. 1836–44. In its revision request, Nissan noted that it previously submitted February 19, 2010 as the start date for the testing phase, but because the FDA "already dismissed this date without explanation," Nissan put forward two additional possible testing phase start dates. A.R. 1840. First, Nissan claimed that the first Notice of Claimed Investigational Exemption ("NCIE") form under 21 C.F.R. § 511.1(b) was submitted on May 5, 2011. A.R. 1840; *see also* A.R. 1848. Alternatively, Nissan offered June 28, 2011, as the date a "major

6

health or environmental effects" test was initiated. A.R. 1841; *see also* A.R. 1422–23 (providing information on reproductive safety study 671596). Nissan also noted that it "believes [the February 19, 2010] date is consistent with some precedential FDA decisions" and there is "inconsistency" in certain regulatory language and FDA statements regarding how to determine the effective date of the INAD. A.R. 1838–40.

On April 12, 2021, the FDA responded to Nissan's revision request. A.R. 1851. The FDA rejected the proffered May 5, 2011 date on the ground that Nissan's submission on that date was a "general correspondence letter that included a notice of intent to import a new animal drug," not an NCIE. A.R. 1853. However, the FDA agreed that reproductive safety study 671596 was a "major health or environmental effects" test and therefore revised its determination to use the start date of that study—June 28, 2011—as the start of the testing phase. A.R. 1853; *see also* A.R. 1855. The FDA also reiterated its conclusion that the first NCIE for BRAVECTO was received on August 4, 2011, and observed that "[t]he Center for Veterinary Medicine (CVM) uses the submission of the first NCIE to determine the effective date for the INAD." A.R. 1853. In a footnote, the FDA provided the following explanation for its continued rejection of the proffered February 19, 2010 start date:

> At the time § 60.22(d) was originally issued, an INAD file was established when we received the first NCIE. Since that time, the opening of an INAD file does not always coincide with the receipt of the first NCIE. In this case, FDA acknowledged the submission of a request to open an INAD file for this drug on February 19, 2010, and your original PTE application asserted the testing phase started on this date, which you described as the 'effective date that INAD 011-903 was granted.' Because FDA generally considers the opening of an INAD file as a housekeeping matter and that the INAD file does not become effective with the

7

simple opening of a file, we reaffirm our determination that the testing phase did not begin on February 19, 2010.

A.R. 1853. The updated regulatory review period determination was published in the Federal Register, A.R. 1855, and later provided to the PTO as the FDA's "final" determination of the regulatory review period, A.R. 1856.

On June 6, 2022, plaintiffs filed this lawsuit challenging the FDA's final determination under the APA as "arbitrary, capricious, and contrary to law." Compl. for Declaratory and Injunctive Relief [Dkt. #1] ("Compl.") ¶ 5; *see also id.* at ¶¶ 135–82. In response to the lawsuit, the FDA asked the Court for a voluntary remand. Defs.' Mot. for a Voluntary Remand [Dkt. #29]. The FDA explained that it had "concerns with the accuracy and adequacy of its April 2021 response" and wished "to reconsider its April 2021 decision in response to Nissan's April 12, 2018 request" to revise the regulatory review period for BRAVECTO. *Id.* at 2. Specifically, the FDA stated that it intended to reconsider the February 19, 2010 and May 5, 2011 dates previously rejected by the FDA. *Id.* at 6. The Court granted the FDA's request and remanded "for further consideration, FDA's response to the revision request filed by Nissan Chemical Industries, Ltd., on April 12, 2018, regarding the regulatory review period for BRAVECTO." Aug. 24, 2022 Min. Order.

In October 2022, while the matter was remanded, Nissan submitted a letter to the FDA to "help identify the key Agency records that should be considered on remand and that support the February 19, 2010 start date for the regulatory review period for BRAVECTO." A.R. 1858. However, the FDA "decline[d] to consider" Nissan's

8

October 2022 letter or the June 6, 2022 Complaint on remand because they sought to raise new arguments and information not contained in the administrative record. A.R. 1937–38. The FDA also believed that consideration of Nissan's October 2022 letter would exceed the scope of the Court's remand. A.R. 1937. Instead, the FDA limited its reconsideration to Nissan's April 12, 2018 revision request, and again concluded that the testing phase for BRAVECTO began on June 28, 2011. A.R. 1938. Following the FDA's December 30, 2022 remand decision, plaintiffs filed an amended complaint addressing the remand decision and again asking the Court to set aside the FDA's final determination and issue an order directing the FDA to recalculate the regulatory review period using February 19, 2010 as the start of the testing phase. Am. Compl. at 68. Defendants filed an answer to the amended complaint, *see* Answer, and the parties proceeded to dispositive motions briefing based on the administrative record, *see* Jan. 18, 2023 Scheduling Order [Dkt. #36].

Pending before the Court are Plaintiff's Motion for Summary Judgment and Defendants' Cross-Motion for Summary Judgment. *See* Pls.' Mot. for Summ. J. [Dkt. #40] ("Pls.' Mot."); Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. [Dkt. #40-1] ("Pls.' Mem."); Defs.' Cross-Mot. for Summ. J. [Dkt. #42] ("Defs.' Cross-Mot."); Combined Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. [Dkt. #42-1] ("Defs.' Mem."); Pls.' Combined Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. and Reply in Supp. of Pls.' Mot. for Summ. J. [Dkt. #44] ("Pls.' Opp'n"); Reply in Supp. of Defs.' Cross-Mot. for Summ. J. [Dkt. #45] ("Defs.' Reply"). The motions are now fully briefed and ripe for review.

## II. LEGAL STANDARD

The standard provided in Federal Rule of Civil Procedure 56 does not govern motions for summary judgment in actions for judicial review of an administrative agency's decision under the APA. *See Barker v. United States*, 404 F. Supp. 3d 251, 260 (D.D.C. 2019); *Moreno v. Spencer*, 310 F. Supp. 3d 83, 86 (D.D.C. 2018). Instead, courts must decide, "as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013). Under the APA, courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or contrary to constitutional or statutory limits. 5 U.S.C. § 706(2); *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 636 (D.C. Cir. 2021). Although review of agency action is generally deferential, *Blanton v. Off. of the Comptroller of the Currency*, 909 F.3d 1162, 1170 (D.C. Cir. 2018), courts must "ensur[e] that agencies have engaged in reasoned decision making," *Iaccarino v. Duke*, 327 F. Supp. 3d 163, 177 (D.D.C. 2018) (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)). "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *City of Olmstead Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quoting *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000)).

## III. ANALYSIS

The key question at issue in this case is whether February 19, 2010 or June 28, 2011 should be used as the start date of the testing phase for BRAVECTO. Plaintiffs put forward three main arguments for why the FDA's decision to use the June 28, 2011 date

was arbitrary and capricious: *first*, the FDA relied on a methodology that contravenes the patent term restoration statute, 35 U.S.C. § 156; *second*, even if the FDA's methodology complied with the statute, the FDA failed to provide fair notice and an adequate explanation of its shift in methodology; and *third*, the FDA's decision is inconsistent with the administrative record because there are other "major tests" that would have resulted in an earlier regulatory review period start date. *See* Pls.' Mot. at 2–3. In its cross-motion, the FDA argues that many of plaintiffs' arguments were forfeited because plaintiffs did not raise them in their July 2014 application or April 2018 revision request. *See* Defs.' Mem. at 11–22. On the merits, the FDA argues that it "reasonably determined" the start of BRAVECTO's testing phase to be June 28, 2011, and this is sufficient to satisfy the APA. *Id.* at 26–39.

It is not necessary for the Court to wade into much of this dispute. Even assuming —without deciding—that the FDA's methodology for determining the start of the testing phase is in accordance with the patent term restoration statute, the FDA acted arbitrarily and capriciously when applying it to BRAVECTO because the FDA did not provide fair notice or an adequate explanation of its shift in methodology. And although the FDA argues that certain other arguments raised by plaintiffs should be treated as forfeited because plaintiffs did not raise them during the administrative process, the FDA does not dispute that the Court can consider this argument. *See* Defs.' Mem. at 12; 26–39. Because this claim is dispositive, the Court need not address the FDA's argument that FDA proceedings are subject to an "impl[ied] [] issue exhaustion requirement." Defs.' Mem. at 13.

11

Dating back to 1991, the FDA publicly signaled that the opening of an INAD file would start the testing phase for a new animal drug. In the 1991 preamble that accompanied the proposed patent restoration regulation, the FDA stated that it "defines the testing phase for an animal drug as the period beginning on . . . the effective date for a notice of claimed investigational exemption for a new animal drug (INAD)," because "the date on which the agency acknowledges the filing of an INAD should constitute the 'effective date' for an INAD." 56 Fed. Reg. 5,784, 5,786 (Feb. 13, 1991). Further, plaintiffs have identified 16 precedents from between 1990 and 2007 in which the FDA started the testing phase on the date that the FDA assigned an INAD number, regardless of whether the request to open an INAD file was accompanied by an NCIE.[2] *See* Am. Compl. ¶¶ 61–76; Answer ¶¶ 61–76. In each of those determinations, the FDA stated that the date an exemption under 21 U.S.C. § 360b(j) became effective was the date of the FDA's letter "assigning a number to the INAD . . . which is considered to be the effective date for the INAD." Am. Compl. ¶¶ 61–76; *see also* Answer ¶¶ 61–76. Similarly, in 2002, the FDA released draft guidance for industry which stated that the testing phase "begins when the sponsor submits a request to CVM to establish an INAD file." *See* Am. Compl. Ex. B. at 7.

---

[2] The FDA argues that plaintiffs should be foreclosed from relying on FDA guidance documents and pre-2009 regulatory review determinations because plaintiffs did not identify those materials during the administrative process. *See* Defs.' Mem. at 12. However, "[r]ather than raising a new issue," plaintiffs are "adducing additional support for [their] side of an issue" that was raised and addressed before the FDA—that is, whether February 19, 2010 should be the start of the testing phase because the INAD file was opened on that date. *See Koch v. Cox*, 489 F.3d 384, 391 (D.C. Cir. 2007); *see also* A.R. 1838–40 (illustrating that Nissan generally flagged concerns regarding "inconsistency" in FDA statements and prior "precedential FDA decisions" in its 2018 revision request with respect to the February 19, 2010 date).

In its 2022 remand decision, the FDA acknowledged this prior approach but stated that it was an "improper application" of 21 C.F.R. § 60.22(d)(1). A.R. 1939. "Beginning in 2009," when the agency realized its error, the FDA "has differentiated the opening of an INAD file, which is a housekeeping matter, from submission of an NCIE," which is what is actually required to start the testing phase. A.R. 1939–40. The FDA also now claims that the 1991 preamble statement, which referred to the filing of an INAD rather than an NCIE, was an "inadvertent error." A.R. 1939–40 n.4. The problem, however, is that the FDA never publicly acknowledged that it was changing course. In fact, in 2015 and 2018, the FDA released updated industry guidance which included the *exact same language* as the 2002 guidance, again stating that the testing phase "begins when the sponsor submits a request to CVM to establish an INAD file." *See* Am. Compl. Ex. F at 10; Am. Compl. Ex. G. at 11. It was not until the FDA's 2022 remand decision that the agency publicly acknowledged these past mistakes and clarified its methodology for determining the testing phase start date. *See* A.R. 1939–40.

"Rule of law principles require that parties have fair notice and an opportunity to conform their behavior to legal rules." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 476 (D.C. Cir. 2020).[3] In determining whether a party received fair notice, the

---

[3] As a threshold matter, the FDA argues that the fair notice doctrine does not apply here because plaintiffs do not have a property interest in the *term* of their patent. *See* Defs.' Mem. at 28–30. However, the fair notice doctrine has extended beyond the Fifth Amendment Due Process Clause and is a well-established principle of administrative law. *See General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995). It is therefore not necessary for the Court to address the handful of cases cited by the FDA in which courts have expressed skepticism regarding whether a patent term is a constitutionally protected property interest. *See Idorsia Pharms. Ltd. v. Iancu*, 393 F. Supp. 3d 445, 456 n.10 (E.D. Va. 2019); *Actelion Pharms. Ltd. v. Kappos*, 972 F. Supp. 2d 51, 54 n.4 (D.D.C. 2013). Although the fair notice doctrine does not apply in all administrative contexts, our Circuit Court has held that the doctrine applies,

13

Court considers whether, "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995). This "ascertainable certainty" rule prevents agencies from taking regulated parties by surprise. *See id.* at 1329–30; *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). Further, although agencies are free to change their existing policies, "the agency must at least 'display awareness that it is changing position'" and the agency "must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "An agency may not, for example, depart from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, plaintiffs argue that they lacked fair notice that the FDA would no longer use the INAD date to start the testing phase. Pls.' Mem. at 23. Plaintiffs further argue that if the FDA had given such notice, they "could have adjusted the timing of the relevant FDA submissions to start the testing phase at an earlier date—*e.g.*, by submitting a separate NCIE form contemporaneously with the INAD application in February 2010."

---

for example, when an agency denies an application to renew a television broadcast license, *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000), dismisses an appeal as untimely, *PMD Produce Brokerage Corp. v. USDA*, 234 F.3d 48, 52–53 (D.C. Cir. 2000), or orders the recall of certain automobiles, *United States v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C. Cir. 1998). The FDA's denial of a request to restore a patent term based on the patent owner's failure to file the right form at the right time falls within this line of precedent.

*Id.* at 24. In response, the FDA argues that the plain regulatory text provided fair notice to plaintiffs that the opening of an INAD file was insufficient to trigger the start of the testing phase because it refers to "the date on which the agency acknowledges the filing of a notice of claimed investigational exemption for a new animal drug." Defs.' Mem. at 31 (quoting C.F.R. § 60.22(d)(1)). "However, an agency is hard pressed to show fair notice when the agency itself has taken action in the past that conflicts with its current interpretation of a regulation." *United States v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C. Cir. 1998). This is especially true where, as here, the agency's past public statements also conflict with the agency's current interpretation. *See Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628–32 (D.C. Cir. 2000).

In resisting this conclusion, the FDA argues that the Court should evaluate whether plaintiffs had fair notice of the FDA's changed methodology as of April 2018, when plaintiffs submitted their revision request, rather than as of February 2010, when they asked the FDA to open an INAD file. *See* Defs.' Mem. at 31. However, one of the key purposes of the fair notice doctrine is to provide parties "an opportunity to conform their behavior to legal rules." *Circus Circus Casinos, Inc.*, 961 F.3d at 476. This would be a hollow promise if the Court conducted the fair notice inquiry as of several years *after* the relevant conduct occurred and at a time when the regulated party was powerless to change its conduct to comply with the agency's new interpretation of its regulation.

Instead, the appropriate inquiry is whether, as of February 2010, plaintiffs would have been "able to identify, with 'ascertainable certainty,' the standards with which the agency expect[ed] parties to conform" in order to trigger the start of the testing phase for

15

BRAVECTO. *General Elec. Co.*, 53 F.3d at 1329. Given the FDA's 1991 preamble statement regarding "the date on which the agency acknowledges the filing of an INAD," the 16 pre-2009 FDA precedents in which the FDA started the testing phase on the date that the FDA assigned an INAD number, and the FDA's 2002 guidance which stated that the testing phase "begins when the sponsor submits a request . . . to establish an INAD file," plaintiffs did not have fair notice as of February 2010 that the FDA would no longer treat the opening of an INAD file as the start of the testing phase. This conclusion is compounded by the fact that the FDA changed its approach in 2009 *sub silentio* and did not repudiate its prior contradictory statements and precedents until 2022. Accordingly, the FDA's regulations, decisions, and statements did not provide fair notice to plaintiffs of the actions they were required to take in order to trigger the start of the testing phase for BRAVECTO, and the FDA's actions therefore violated the APA.

### IV. CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Summary Judgment will be GRANTED, defendants' Cross-Motion for Summary Judgment will be DENIED, and this matter will be REMANDED to the FDA to recalculate the regulatory review period of BRAVECTO using February 19, 2010, as the start date of the testing phase. An order consistent with this decision accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge